**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

ANDRES TORRES, individually and on behalf of all others similarly situated,

        Plaintiff,

  v.

GENERAL MOTORS LLC,

        Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Andres Torres ("Plaintiff") brings this class action lawsuit against General Motors LLC ("GM" or "Defendant") on behalf of himself and all other similarly situated persons who purchased or leased 2017-2019 model year Chevrolet Bolt EVs (hereafter "Chevrolet Bolt," "Chevy Bolt," "Bolt" or "Class Vehicles"). As described in more detail below, Plaintiff seeks economic damages because the Class Vehicles are defective and were deceptively marketed to consumers.

## INTRODUCTION

1. In 2017, GM introduced the Chevrolet Bolt, a new plug-in, all-electric vehicle. GM rolled out the Bolt to compete with similar all-electric vehicles released by Tesla, Nissan, and BMW.

2. Electric vehicles like the Bolt offer the potential to be relatively environmentally-friendly and provide savings on gas, but these perks come with a trade-off: electric vehicles often travel only a fraction of the distance of conventional gas-powered cars before needing to be

recharged. As such, the driving range of a vehicle's battery is one of the most critical factors to consider in purchasing any battery-charged electric vehicle.

3.      GM was well aware of the importance that consumers placed on an electric car's battery range, and marketed the Bolt accordingly. It touted the Chevy Bolt's battery as being "where it all starts," advertising an energy capacity of 60 kWh, which GM said allowed drivers to travel an EPA-estimated 238 miles of range on a full charge.[1] An example of one such advertisement touting the Bolt's battery capabilities appears below.



4.      GM's marketing campaign was successful. The Chevy Bolt received the prestigious 2017 Motor Trend Car of the Year accolade as being a "game changer" due in part to the 238 miles the "EPA has certified the [Chevy] Bolt will travel on a full charge.[2]  It was hailed as being "[a] better car, better package, much better handling, with twice the range."  (*Id.*)  It was similarly awarded titles for the 2017 North American Car of the Year,[3] and 2017 Green Car of the Year.[4]

---

[1] https://www.dublinchevrolet.com/Chevrolet-Bolt-EV (last visited Nov. 30, 2020); *see also*, https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Nov. 30, 2020).
[2] https://www.motortrend.com/news/chevrolet-bolt-ev-2017-car-of-the-year/ (last visited Nov. 30, 2020).
[3] https://northamericancaroftheyear.org/chevrolet-bolt-chrysler-pacifica-honda-ridgeline-named-2017-north-american-car-truck-and-utility-vehicle-of-the-year/ (last visited Nov. 30, 2020).
[4] https://www.autoblog.com/2016/11/17/chevy-bolt-wins-2017-green-car-of-the-year/ (last visited Nov. 30, 2020).

5.     The actual performance of the Chevy Bolt, however, is far from ideal. Unfortunately for consumers like Plaintiff, the Class Vehicles suffer from a serious defect that results in a severe loss of potential battery mileage of the high voltage batteries in order to avoid risk of fire. Specifically, when the high voltage batteries are charged to full, or very close to full, they pose a risk of fire[5] (the "Battery Defect"). GM's purported "fix" to reduce the risk of fire is a software update that limits the maximum state of charge to approximately 90% battery capacity, thereby reducing the amount of mileage that these vehicles can otherwise travel on a full charge. To achieve this, Chevy Bolt owners must schedule a service appointment with their dealerships to apply a software update to change the vehicle charge settings or, alternatively, use the car's "Hill Top Reserve" option which limits charging of the battery to 90%.

6.     Further, upon information and belief, GM overstates the battery capacity of the Class Vehicles. Despite advertising the Chevy Bolt as having a 60kWh capacity, the label on the LG Vista 2.0 battery module is only 57kWh.

7.     GM failed to inform prospective owners and lessees of the Chevy Bolt that the vehicle is plagued with this dangerous Battery Defect and that owners and lessees of the Class Vehicles will be forced to decide between a risk of a potentially fatal car fire or a significant power loss. Defendant GM further failed to inform consumers that the battery capacity is less than advertised, or that the vehicles would require a "fix" that reduces their driving range by 10%.

8.     GM's conduct has placed Bolt purchasers into an untenable position: either continue to drive and use a vehicle that poses a risk of catching fire or acquiesce to GM's recommended "fix" to reduce the battery's capacity.

---

[5] https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited Nov. 30, 2020).

9.      Plaintiff brings this class action lawsuit on behalf of himself and a class of similarly situated consumers who have purchased or leased one or more of the Class Vehicles (the "Class" or "Class Members").

10.     Plaintiff and the Class seek redress for GM's violations of the Illinois Consumer Fraud and Deceptive Practices Act, Illinois Uniform Deceptive Trade Practices Act, Magnuson-Moss Warranty Act, fraudulent concealment/fraud by omission, and GM's breaches of express and implied warranties.

11.     Plaintiff and the Class seek actual damages, restitution, and equitable relief, as well as statutorily-permitted reasonable attorneys' fees and costs of suit and pre- and post-judgment interest. Plaintiff also seeks punitive damages as a result of GM knowingly introducing defective Class Vehicles into the marketplace and defrauding consumers across the nation.

## PARTIES

**A.     Plaintiff**

12.     Plaintiff Andres Torres is an adult individual who resides in Bolingbrook, Illinois. In or around August 2019, Plaintiff purchased a 2017 Chevy Bolt from a dealership in Downers Grove, Illinois, an authorized GM retailer.

**B.     Defendant General Motors**

13.     Defendant GM is a limited liability company organized under Delaware law with its principal office located at 300 Renaissance Center, Detroit, Michigan 48265. Defendant designs, tests, markets, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including but not limited to Chevrolet, Buick, GMC, and Cadillac in this district and throughout the United States.

## JURISDICTION

14.    This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) at least one Class Member is a citizen of a different state than Defendant. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Defendant because it is present, licensed to conduct business, and does conduct business regularly in this District; and Defendant has sufficient contacts with this District.

## VENUE

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business in this District, including sales and advertising, and Defendant is subject to personal jurisdiction in this District. Additionally, a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred within this District.

## FACTUAL ALLEGATIONS

### A.    GM Markets and Sells the Chevrolet Bolt

17.    GM first introduced the Chevrolet Bolt in 2017. The Chevrolet Bolt is GM's all-electric, plug-in vehicle, launched to compete with the likes of electric vehicles released by Tesla, Nissan, and BMW.

18.    The Chevrolet Bolt is a front-motor, five-door, all-electric small hatchback. A picture of the 2017 Chevrolet Bolt is below:



19.    Since its release, approximately 94,958 Chevy Bolts have been sold worldwide. They are available for purchase in the United States, South Korea, Mexico, Canada.[6]

20.    One of the core considerations in an all-electric vehicle is the capacity and range of the battery. Because charging stations are not as frequently located as gas stations, an all-electric vehicle's usefulness depends in large part on the distance the vehicle can travel before needing a recharge. Electric car buyers rely on the manufacturer's representations about an electric vehicle's ability to travel on a single charge. In addition to price, range is a primary consideration of consumers when deciding to purchase an electric vehicle.

21.    GM touted the Class Vehicles as having a battery capacity of 60 kWh which would result in an EPA-estimated travel range of 238 miles without recharging. GM has maintained these representations since it began marketing the Class Vehicles to the general public. GM published

---

[6] *See* https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last accessed Nov. 30, 2020).

this estimated travel range in several places, including in a GM specifications sheet disclosing that the vehicle was able to maintain a driving range of an "EPA-estimated 238 miles"[7] and a "product information" fact sheet regarding the 2017 Bolt that confirmed "an EPA-estimated 238 miles of range."[8]

22.     GM marketed the driving range as one of the Chevrolet Bolt's main selling points in its national advertising campaign. It touted the battery as "where it all starts" and as making it possible to get drivers to the places they need to go.  It also represented the battery capacity to be 60 kWh.[9]

23.     GM made these same representations about the 2018 and 2019 model Chevrolet Bolt, again marketing the vehicle as having an alleged EPA-estimated range of 238 miles.[10]

**B.     The Chevrolet Bolt Suffers from a Battery Defect that Leads to Fire Risk When the Battery Is Fully Charged**

24.     Lithium-ion batteries, such as the one used in the Chevrolet Bolt, are a key component of electric vehicles due to their high specific energy, high power, and long life cycle.

25.     Drivers rely on the capacity and safety of the lithium-ion batteries which serve as the Chevrolet Bolt's sole power source.

26.     However, unbeknownst to Plaintiff and the Class, the Class Vehicles are equipped with a Battery Defect which renders the battery susceptible to catching fire when fully charged.

---

[7] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.tab1.html (last visited Nov. 30, 2020).

[8] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.html (last visited Nov. 30, 2020).

[9] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.tab1.html (last visited Nov. 30, 2020).

[10] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.tab1.html; https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2018.html; https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2019.html (last visited Nov. 30, 2020).

Rather than inform consumers about the existence of this Battery Defect at the time of purchase, GM instead encouraged Chevy Bolt owners to "top off your battery as much or as little as you like."[11]

27.     Indeed, in a Facebook Q&A in October of 2019, Chevy Bolt EV Expert Adam Piper, Energy Performance Engineer at GM, dispelled rumors that Chevy Bolt EV owners should avoid charging their batteries to 100%, stating: "We engineered the battery system so that you can charge to 100% and maximize range. Do whatever is best for your personal circumstances. If you want maximum range, charge to 100%. If you want to leave room for regenerative energy when you start to drive, use Target Charge/Hill Top Reserve."[12]

28.     However, the opposite is true. The Battery Defect renders the battery susceptible to catching fire at full or near-full charge unless and until Class Vehicle owners modify their vehicle settings to severely deplete the battery capacity by 10%, thereby reducing the anticipated vehicle range well below the EPA-estimated range of 238 miles that consumers were promised when they purchased their Class Vehicles.

29.     On November 13, 2020, GM made an announcement to all of its authorized detailers of its intent to recall 68,667 Chevrolet Bolt EV vehicles—over 50,000 of which are in the United States—equipped with design-level N2.1 batteries produced at LG Chem's Ochang, Korea plant. Through its own investigation, GM concluded that the battery pack posed a risk of fire when charged to full, or very close to full, capacity.

---

[11] https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Nov. 30, 2020).

[12] *See* Birkett, Steve, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, Torque News (Oct. 31, 2019), available: https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last accessed Nov. 30, 2020).

30.     All Class Vehicles are affected by the recall. Curiously, the 2020 model year Chevrolet Bolt EVs do not have this same issue because they reportedly "use a different battery-cell design than the vehicles affected by this recall."[13]

31.     But rather than issue a complete recall of the vehicles to replace the dangerous batteries, GM has informed the National Highway Traffic Safety Administration ("NHTSA") that the purpose of the recall is to instead install an interim software fix to reprogram the hybrid propulsion system control module to reduce the battery's charge capacity by 10%, thereby reducing battery's range to approximately 214 miles on a single battery charge (based on the EPA-estimated and GM-reported 238 mile range). GM recommends that Class Vehicle owners schedule a service appointment with their local dealerships to update the vehicle's battery software to automatically limit the maximum state of charge to 90%, or owners can modify the car settings themselves. Before bringing the Bolt to their local dealerships, GM asks that Class Vehicle owners change the vehicle charge settings to use the "Hill Top Reserve" option as a means of limiting the batteries' charge. For Class Vehicle owners who are unable to make these changes to limit the charging level of their vehicle, GM recommends that those owners should not park their car in their garage or carport until after they have visited their local dealer.

32.     Class Vehicle owners are thus faced with a Hobson's choice: either do nothing and risk a potentially fatal car fire, or install a temporary software update which significantly diminishes the life of the car battery, thereby resulting in driving range reduced by 10%.

---

[13] *See* Brown, Laura, *50,000 Chevy Bolt EVs Recalled; Owners Told Not to Park in Garages, Near Houses* (Nov. 13, 2020), available: https://www.caranddriver.com/news/a34672772/chevrolet-bolt-ev-recall-battery/ (last accessed Nov. 30, 2020).

33.     GM has been aware of the defects in its battery management system and battery cell imbalances since at least 2017. Nonetheless, GM has sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that they contain defective and potentially dangerous batteries.

**C.     GM's Knowledge of and Response to the Battery Defect**

34.     The Chevrolet Bolt has long been plagued with battery defects. Indeed, GM has been aware since at least 2018 that there were defects in its batteries and energy management systems. On or around April 2, 2018, GM Chevrolet issued a customer satisfaction notice for drivers of the 2017 Chevrolet Bolt to get a software update to provide more warning about any potential "cell low-voltage condition" and reduced propulsion. Essentially, the current software would not provide sufficient warnings prior to a battery cell low range condition, which may result in a loss of propulsion.[14]

35.     GM issued an additional statement on May 11, 2018, providing additional warnings, asking all Bolt customers to schedule a service appointment to receive the latest software which would "increase[ ] the accuracy of the range estimation, in addition to providing more warning at low states of charge."[15]

36.     In August 2018, GM issued another Customer Satisfaction Program regarding loss of propulsion high voltage battery without notification, this time disclosing that "Certain 2017-2018 model year Bolt EV vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the

---

[14] *See* https://static.nhtsa.gov/odi/tsbs/2018/MC-10143682-9999.pdf (last accessed Nov. 30, 2020).
[15] *See* https://insideevs.com/news/337521/update-possible-chevy-bolt-battery-cell-failure-prompts-gm-statement-recall/ (last accessed Nov. 30, 2020).

indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion. Only certain vehicles will experience the battery low voltage cell condition."[16]

37.     Tim Grewe, GM's chief engineer of electric propulsion systems, publicly acknowledged the loss of propulsion problems in an interview with InsideEvs in 2019, confirming the battery's diminished capacity to hold the voltage.[17]

38.     By 2020, GM was receiving complaints about fires stemming from the battery pack, which prompted GM to initiate an internal investigation spanning from August to November of 2020.

39.     Despite its knowledge, GM failed to notify Plaintiff and members of the Class of these problems and associated hazards at the time of purchasing their Class Vehicles.  Instead, GM did not perform its recall until several fires occurred in the Class Vehicles, delaying the recall to avoid the financial ramifications of having to acknowledge that its Class Vehicles and car batteries were inherently defective by design and incapable of safely providing customers with GM's advertised 238 mile driving range.

40.     GM actively concealed the fact that its representations regarding the Class Vehicle's battery range were false, based only on unreasonable usage of the battery at maximum capacity which would vastly increase the risk of fire even while the Class Vehicles are in operation. GM withheld the fact that the existence of the Battery Defect would diminish car owners' usage of the Class Vehicles and also depreciate their vehicle's intrinsic and resale value.

---

[16] *See* https://static.nhtsa.gov/odi/tsbs/2018/MC-10145176-9999.pdf (last accessed Nov. 30, 2020).

[17] *See* https://insideevs.com/news/342671/my-chevy-bolt-is-on-third-battery-pack-heres-why/ (last accessed Nov. 30, 2020).

41.     GM publicly announced the Battery Defect in the form of a recall on November 13, 2020.[18]  GM Recall number N202311730 revealed, in pertinent part, that "GM has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles … that may pose a risk of fire … GM has developed software that will limit vehicle charging to 90% of full capacity… ."

| GM Recall #: | NHTSA # | | Date Issued: |
| --- | --- | --- | --- |
| N202311730 | 20V701 | | Nov 13, 2020 |

**Recall Title:**

High Voltage Battery May Melt or Burn

**Recall Description:**

General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles. A select number of these vehicles were built with high voltage batteries produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity. While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk.

**Safety Risk Description:**

If the batteries in select vehicles within this population are charged to full capacity, or very close to full capacity, the batteries may pose a risk of fire.

**Repair Description:**

As an interim remedy, dealers will reprogram the hybrid propulsion control module 2 (HPCM2) to limit full charge to 90%.

**Customer Action:**

For more information, customers can visit www.chevy.com/boltevrecall or contact the Chevrolet EV Concierge 1-833-EVCHEVY or their preferred dealer.

**Recall Status:** INCOMPLETE

---

[18]https://my.gm.com/recalls?vin=1G1FX6S07J4120452&evar36=eml_monthly_onstar_OVD&vels=662483105 (last visited Nov. 30, 2020).

42.     Instead of offering owners a full recall to completely replace the defective battery, GM only instituted a software update, a mere band-aid to provide a less than suitable temporary remedy for a significant and potentially dangerous defect.  However, the "Recall Status [remained] "IMCOMPLETE" and only an "interim remedy" to limit the full charge of the battery was actually deployed.

43.     Specifically, the only "fix" that appears to have been provided by GM is a software update that results in reducing the range of the Class Vehicles 10% below what was advertised.

44.     This can hardly be said to be an upgrade at all; if anything, it only adds to the "range anxiety" that Chevrolet Bolt vehicles already create – the deep-seated fear of many electric vehicle drivers that their vehicle will not have sufficient mileage or power to get them from point A to point B safely.[19]

45.     While "GM said it understands owners could be upset about their cars not being fully functional", it will only "address complaints on a case-by-case basis."[20] To date, Plaintiff is unaware of any legitimate measure taken by GM to actually fix the underlying battery issue other than its provision of an upgrade in the vehicle's software to reduce the battery's charging capacity.

46.     Upon information and belief, no further remedial measures have been taken, and GM has yet to provide Plaintiff and Class Members with a permanent solution to remedy the Battery Defect.

---

[19]  *See* Brooks, Allen, *EV "Range Anxiety": Real World Issues*, MasterResource (July 10, 2017), available:  https://www.masterresource.org/electric-vehicles/ev-batteries/ (last accessed Nov. 30, 2020).
[20] https://abcnews.go.com/Technology/wireStory/gm-recalling-69k-bolt-electric-cars-due-fire-74194714 (last visited Nov. 30, 2020).

**D.**     **Plaintiff's Experiences with the Chevrolet Bolt**

47.     Plaintiff's experiences with his Class Vehicle are in line with countless other Chevrolet Bolt owners' and lessees' complaints about and experiences with this vehicle.

48.     In or around August 2019, Plaintiff Torres purchased a used 2017 Chevrolet Bolt (VIN No. 1G1FX6S02H4184134) from an authorized dealership in Downers Grove, Illinois.

49.     Plaintiff Torres purchased his Chevrolet Bolt as a pleasure vehicle, but also to commute to work, which is a 162-mile roundtrip door-to-door from his home in Bolingbrook, Illinois to his employer in Kenosha, Wisconsin. His wife and his daughter occasionally drive the car as well.

50.     Plaintiff Torres made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, particularly considering his long commute to work.

51.     After Plaintiff Torres was notified about the recall on or around November 13, 2020, within two weeks, he brought his 2017 Chevrolet Bolt to the local dealership for the software fix.

52.     After his dealership installed the software fix, the estimated range on Plaintiff Torres's car declined and was drastically less than the range of 238 miles that Plaintiff Torres expected he would be getting when he purchased his vehicle.

53.     The software patch installed on Plaintiff Torres's vehicle reduces the range of the vehicle. Plaintiff Torres is concerned about the range falling even further during the cold winter months in Illinois and Wisconsin, as he currently cannot turn the heat on to and from work in

order to make it back and forth to work. Prior to installing the software patch, Plaintiff Torres was able to use the heat in his car to and from work.

54.     Plaintiff Torres now has range anxiety on his long commute to work due to the reduced range after the software update, which is a major concern for him.

55.     When Plaintiff Torres purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "fix" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

56.     Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Torres would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

E.   **Numerous Other Chevrolet Bolt Owners and Lessees Have Complained of the Defect**

57.     Plaintiff's experience is neither unique nor isolated. Defendant's defective Chevrolet Bolt has drawn the attention and ire of consumers around the country, with countless angry customers taking to the Internet to voice their discontent over their vehicles and the response (or lack thereof) by GM.

58.     A small sample of the countless consumer complaints and negative reviews about the Chevrolet Bolt Battery Defect issue are reproduced below [all *sic*]:

    a.   NHTSA

        • October 30, 2020 NHTSA ID NUMBER: 11372429

        Incident Date October 21, 2020

        IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, WE WERE WOKEN UP BY SMOKE/FIRE ALARMS. WE STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF SEARCHING INSIDE THE HOME AND FINDING NOTHING, WE REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING FROM THE GARAGE

AND WHEN THE MUDROOM DOOR WHICH LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT THE CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE IN THE GARAGE. THE CHEVY BOLT WAS PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT , AS HAS BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8 MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION, EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE INVESTIGATION.[21]

---

[21] *See* https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%2520EV/5%2520HB/FWD (last accessed Nov. 30, 2020).

• October 16, 2020 NHTSA ID NUMBER: 11364692

Incident Date October 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED
TO SMOKE FROM UNDER THE CAR. THE SOUND OF
POPPING NOISES WERE HEARD AND THEN 10 MINUTES
LATER THE CAR WAS ENGULFED IN FLAMES. THE CARS
BATTERY PACK STARTING POPPING THEN EXPLODED IN
FLAMES.[22]

• July 17, 2020 NHTSA ID NUMBER: 11339878

Incident Date July 4, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND
DRIVEN FOR 12 MILES TO OUR DESTINATION, A
TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR
OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED
IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR
RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT
HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT
THE BACK OF THE CAR. I CALLED 911 AND
FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN
HOUR AFTER SMASHING THE REAR WINDOW TO GET
ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN
AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE
RESTARTED. SMOLDERING WAS SO HOT IT PARTLY
BURNED THE BACKSEAT. ONCE THE CAR WAS COOL
ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT
WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO
SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS
PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE
SMOKE WAS SMALL AND STARTED ON THE AREA
WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED;
MINUTES LATER THE SAME HEAVY SMOKE CAME OUT
FAST FROM UNDERNEATH THE FRONT PASSENGER
SIDE. THE POLICE WERE THERE TO WITNESS THAT
INCIDENT. IT WAS AROUND MIDNIGHT THEN.
3 SPONTANEOUS COMBUSTIONS IN 4 HOURS; DOOR
CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN

---

[22] *See id.*

OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING AND PEOPLE GETTING HURT? HOW MANY WILL IT TAKE FOR GM TO CARE? THIS CAR'S DAMAGE LOOKS SIMILAR TO MINE[23]

    b. <u>Twitter</u>

- <u>From @MegMcCutch on 11/2020[24]</u>
  1. So the recall for the Chevy Bolt was because the main battery is a fire hazard. Their fix? To permanently reduce the battery max charge by 10%. Class action lawsuit anyone? Not worth $40k.

    c. <u>Detroit Free Press</u>

- <u>From craig_c. 2 weeks ago:[25]</u>

  1. If the technology is truly there wouldn't they replace the battery and rework the charging hardware so you can charge to 100 percent? There "FIX" means you just lost 10 percent of your range

---

[23] *See* https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%2520EV/5%2520HB/FWD (last accessed Nov. 30, 2020).
[24] https://twitter.com/MegMcCutch/status/1329974156713201667
[25] *See* https://cm.freep.com/comment/?storyUrl=https%3A%2F%2Fwww.freep.com%2Fstory%2Fmoney%2Fcars%2Fgeneral-motors%2F2020%2F11%2F13%2Fgm-recalls-chevy-bolts-fire-risk%2F6280041002%2F&marketName=freep&commentsopen=false (last accessed Nov. 30, 2020).

    d.  <u>Reddit</u>
- <u>From IAMA_HOMO_AMA 17 days ago:</u>[26]



- <u>From effects MT, TM3 17 days ago:</u>[27]



- <u>From Aliens_Unite 17 days ago:</u>[28]



## F.  **GM Sold and Continues to Sell Class Vehicles with Knowledge of the** **Battery Defect**

59.    As set forth above, GM marketed, distributed, and sold Chevrolet Bolt vehicles in multiple states across the nation, including in the State of Illinois.

---

[26] *See* https://www.reddit.com/r/BoltEV/comments/jtl07l/bolt_recall/ (last accessed Nov. 30, 2020).

[27] *See id.*

[28] *See* https://www.reddit.com/r/technology/comments/jtscgg/gm_recalls_68000_electric_chevy_bolts_over/ (last accessed Nov. 30, 2020).

60.     GM knew or should have known that the Class Vehicles were being advertised and sold with false and misleading representations regarding the range of the Class Vehicles and the risk of fire posed by the defective batteries. However, despite this knowledge, GM has failed to compensate owners and lessees who purchased Class Vehicles. Instead, GM has implemented a temporary software update which comes at a significant cost to functionality, reducing the battery capacity and resulting mileage capabilities by 10%.

61.     Due to these defects, the Chevrolet Bolt is defective and is not fit for its intended purpose.

62.     As a result of GM's unfair, deceptive and/or fraudulent business practices, Class Members have been deprived of the benefit of their bargain, lost use of their Class Vehicles for extended periods of time, been exposed to dangerous conditions, and have incurred lost time and out-of-pocket costs. Class Vehicles also have suffered a diminution in value due to the Battery Defect.

## **CLASS ALLEGATIONS**

63.     Plaintiff brings this action on his own behalf, and on behalf of the following Nationwide Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> **All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased for end use and not for resale.**

64.     Plaintiff brings this action on his own behalf, and on behalf of the following Illinois Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> **All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of Illinois for end use and not for resale.**

65.     Together, the Nationwide Class and the Illinois Class shall be collectively referred to herein as the "Class."

66.     Excluded from the Class are: Defendant, its affiliates, subsidiaries, parents, successors, predecessors, any entity in which Defendant or its parents have a controlling interest; Defendant's current and former employees, officers and directors; the Judge(s) and/or Magistrate(s) assigned to this case; any person who properly obtains exclusion from the Class; any person whose claims have been finally adjudicated on the merits or otherwise released; and the parties' counsel in this litigation.  Plaintiff reserves the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

67.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual Class Members are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that tens of thousands of Class Members have been subjected to the conduct by Defendant alleged herein. Indeed, as stated above, reports indicate that between 2017 – 2019 more than 57,000 Chevy Bolt vehicles have been sold nationwide.[29]

68.     **Existence/Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

      a.     Whether GM engaged in the conduct alleged herein;

---

[29] https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last visited Nov. 22, 2020).

b.      Whether GM knew about the Battery Defect but failed to disclose it and its consequences to GM customers of Class Vehicles;

c.      Whether a reasonable consumer would consider the Battery Defect or its consequences to be material;

d.      Whether GM's conduct alleged herein violates consumer protection statutes, false advertising laws, warranty laws, and other laws as asserted herein;

e.      Whether Plaintiff and Class Members overpaid for their Class Vehicles in light of the Battery Defect;

f.      Whether Plaintiff and Class Members are entitled to damages, including punitive damages, as a result of GM's conduct alleged herein, and if so, the amount or proper measure of those damages; and

g.      Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

69.     **<u>Typicality</u>**: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all Class Members were injured in the same manner by Defendant's uniform course of conduct described herein.  Plaintiff and all Class Members have the same claims against Defendant relating to the conduct alleged herein, and the same events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all Class Members.  Plaintiff and all Class Members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct in selling and failing to remedy defective Class Vehicles. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

70.    **Adequacy:** Plaintiff is an adequate representative for the Class because his interests do not conflict with the interests of the Class that he seeks to represent. Plaintiff has retained counsel competent and highly experienced in complex class action litigation – including consumer fraud and automobile defect class action cases – and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

71.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and all Class Members. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them by Defendant. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, *etc.*) Defendant maintains regarding its sales and leases of Class Vehicles.

72.    Defendant has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## COUNT I
## Common Law Fraud

73.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

74.     Defendant made material omissions concerning a presently existing or past fact. For example, Defendant did not fully and truthfully disclose to its customers the true nature of the inherent Battery Defect. A reasonable consumer would have expected that the Chevy Bolt would not be defective and pose a serious safety risk. The facts concealed or not disclosed by Defendant to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price. Had Plaintiff and the Class known about the defective nature of the Class Vehicles and their Battery Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. As a result, Plaintiff and the other Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defects and all of the resultant problems.

75.     These omissions were made by Defendant with knowledge of their falsity, and with the intent that Plaintiff and Class Members rely upon them.

76.     Plaintiff and Class Members reasonably relied on these omissions, and suffered damages as a result. To the extent that Defendant's conduct was willful, oppressive or malicious, Plaintiff and Class Members are entitled to an award of punitive damages.

## COUNT II
## Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (815 Ill. Comp. Stat. 505/1, *et seq.* and 720 Ill. Comp. Stat. 295/1A)

77.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

78.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Illinois Class.

79.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce. Specifically, the Act prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

80.     Defendant is a "person" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(c).

81.     Plaintiff is a "consumer" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(e).

82.     Defendant's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

83.     Defendant knew that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

84.     Defendant had the duty to Plaintiff and the Class members to disclose the Battery Defect and the defective nature of the Class Vehicles because:

      a.  Defendant was in a superior position to know the true state of facts about the Battery Defect and its associated costs;

      b.  Plaintiff and the Class members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

    c.   Defendant knew that Plaintiff and the Class members could not reasonably have been expected to learn about or discover the Battery Defect and the effect it would have on the Class Vehicles' range and energy efficiency.

85.    In failing to disclose the Battery Defect and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

86.    The facts Defendant concealed or did not disclose to Plaintiff and the Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the Class known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

87.    Defendant's conduct caused Plaintiff's damages as alleged.

88.    As a result of Defendant's wrongful conduct, Plaintiff and the Illinois Class have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, court costs, and reasonable attorneys' fees pursuant to 815 Ill. Comp. Stat. 505/1, *et seq.*

**<u>COUNT III</u>**
**Violation of Illinois Uniform Deceptive Trade Practices Act**
**(815 Ill. Comp. Stat. 505/1, *et seq.* and 720 Ill. Comp. Stat. 295/1A)**

89.    Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

90.    Plaintiff brings this claim on behalf of himself and on behalf of the members of the Illinois Class.

91.    815 Ill. Comp. Stat. 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any

of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . (9) advertises goods or services with intent not to sell them as advertised; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

92.     Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

93.     The Class Vehicles sold to Plaintiff and the Illinois Class were not of the particular sponsorship, approval, characteristics, ingredients, uses benefits, or qualities represented by Defendant.

94.     The Class Vehicles sold to Plaintiff and the Illinois Class were not of the particular standard, quality, and/or grade represented by Defendant.

95.     Defendant caused to be made or disseminated through Illinois and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Defendant should have known to be untrue and misleading to consumers, including Plaintiff and other Class members.

96.     Defendant has violated section 17500 because its misrepresentations and omissions regarding the safety, reliability, functionality, and energy efficiencies of the Class Vehicles were material and likely to deceive a reasonable consumer.

97.     Plaintiff and the other Illinois Class members have suffered injuries in fact, including the loss of money or property, resulting from Defendant's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff and the other Illinois Class members relied on Defendant's misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendant's representations were untrue because it distributed the Class Vehicles with the Battery Defect. Had Plaintiff and the other Class members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, Plaintiff and the other Illinois Class members did not receive the benefit of their bargain.

98.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Illinois and nationwide.

99.     Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiff and the Illinois Class.

100.    As a result of the foregoing wrongful conduct of Defendant, Plaintiff and the Illinois Class have been damaged in an amount to proven at trial, including, but not limited to actual and punitive damages, equitable relief and reasonable attorneys' fees.

## COUNT IV
### Breach of Implied Warranty of Merchantability
### (810 Ill. Comp. Stat. 5/2-314 and 810 Ill. Comp. Stat. 5/2A-212)

101.    Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

102.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Illinois Class.

103.     Defendant impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

104.     Defendant breached the implied warranty that the Class Vehicle was merchantable and safe for use as public transportation by marketing, advertising, distributing and selling Class Vehicles with the common design and manufacturing defect.

105.     These defects existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time they were sold to Plaintiff.

106.     These defects were the direct and proximate cause of damages to Plaintiff and the Illinois Class.

**COUNT V**
**Breach of Express Warranty**
**(810 Ill. Comp. Stat. 5/2-313)**

107.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

108.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Illinois Class.

109.     Defendant expressly warranted – through statements and advertisements – that the Class Vehicles were of high quality, and at a minimum, would work properly and safely.

110.     Defendant breached this warranty by knowingly selling vehicles with dangerous defects.

111.     Plaintiff and the Illinois Class have been damaged as a direct and proximate result of Defendant's breaches in that the Class Vehicles purchased by Plaintiff and the Illinois Class were, and are, worth far less than what they paid to purchase, which was reasonably foreseeable to Defendant. Benefits associated with the defective designs and manufacturing are vastly outweighed by the real risks associated with the Battery Defect.

112.     The Class Vehicles were defective as herein alleged at the time they left Defendant's factories, and the vehicles reached Plaintiff and Class Members without substantial change in the condition in which they were sold.

113.     As a direct and proximate result of Defendant's breaches, Plaintiff and the Illinois Class have suffered damages, including, but not limited to, diminution in value, return of lease payments and penalties, and injunctive relief related to future lease payments or penalties.

<u>**COUNT VI**</u>
**Fraudulent Concealment / Fraud by Omission**

114.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

115.     Plaintiff brings this claim on behalf of himself and on behalf of the members of the Class.

116.     Defendant intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiff and the Class highly relevant information to their purchasing decision.

117.     Defendant further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the vehicles it was selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

118.    Defendant knew these representations were false when made.

119.    The Class Vehicles purchased or leased by Plaintiff and the Class were, in fact, defective, unsafe, and unreliable, because the vehicles' batteries were susceptible to bursting into flame when fully charged or nearly fully charged.

120.    Defendant had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to battery failure because Plaintiff relied on Defendant's material representations that the Class Vehicle's battery could be safely charged to permit the vehicles to travel for a reported range of 238 miles on a single full charge.

121.    The aforementioned concealment was material because if it had been disclosed Plaintiff would not have bought or leased the vehicle or would have bought or leased the vehicle at a substantially reduced price.

122.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. Defendant knew or recklessly disregarded that its representations were false, but intentionally made the false statements to sell vehicles.

123.    Plaintiff relied on Defendant's reputation – along with Defendant's failure to disclose and Defendant's affirmative assurance that its vehicles would safely and reliably travel the disclosed driving range – when purchasing Defendant's Class Vehicle.

124.    Plaintiff and the Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

125.     Defendant's conduct was knowing, intentional, with malice, and demonstrated a complete lack of care and was in reckless disregard for the rights of Plaintiff and the Class. Plaintiff and the Class are therefore entitled to an award of punitive damages.

**COUNT VII**
**Unjust Enrichment**

126.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

127.     Plaintiff and Class Members have overpaid for their defective Class Vehicles in amounts that they would not have paid to purchase or lease the vehicles had they known of the deceleration defect.

128.     Defendant has been unjustly enriched by these overpayments which were obtained by the conduct described herein, and equity militates against Defendant retaining these ill-gotten gains.

129.     Defendant should be required to relinquish the monies it obtained and disgorge its profits from sales of defective Chevy Bolt vehicles as restitution to place Plaintiff and Class Members in the position in which they would have been had Defendant not knowingly sold Class Vehicles with a concealed Battery Defect that causes a potential vehicle fire.

**COUNT VIII**
**Breach of Express Warranty**

130.     Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

131.     Plaintiff and other Class Members formed a contract with Defendant at the time they purchased their Class Vehicles.  The terms of the contract include the promised and affirmation of fact and express warranties made by Defendant.

132.    Defendant's 2018 and 2019 Limited Warranty and Owner Assistance Information provides that, "in addition to the express conditions and warranties" and the "Bumper-to-Bumper Coverage" of 3 years/36,000 miles, Defendant will "warrant certain components for each Chevrolet…Bolt EV…for 8 years or 100,000 miles…against warrantable repairs to the specific electric propulsion components of the vehicle" which includes repair and replacement to the "Electric Propulsion Battery."[30]

133.    Plaintiff and Class Members' Class vehicles did not perform as promised due to the Defect.

134.    Defendant has actual knowledge that it breached the express warranties with Plaintiff and Class Members related to the Class Vehicles.

135.    Defendant breached the terms of the express warranties with Plaintiff and Class Members by not providing the Class Vehicles with properly functioning batteries.

136.    Plaintiff sought assistance for his Class Vehicle from Defendant pursuant to its recall during the express warranty period.  However, no permanent fix is available and his Class Vehicle has not been repaired and restored to the condition warranted.

137.    As the foreseeable and actual result of Defendant's breach of express warranties, Plaintiff and Class Members were damaged in an amount that is the difference between the value of the Class Vehicles if they had possessed batteries as warranted and performed as represented, and the value of the Class Vehicles they actually received.

---

[30] https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/2018-chevrolet-limited-warranty-and-owner-assistance-information.pdf;
https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/19_CHEV_WM_.pdf; ; see also, https://www.chevrolet.com/important-information

<u>COUNT IX</u>
**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***

138.    Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing paragraphs.

139.    Plaintiff is a "consumer within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

140.    Defendant is a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

141.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

142.    The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(d)(1) provides for a cause of action for any consumer who is damaged by the failures of a warrantor to comply with a written warranty.

143.    Defendant's representations as described herein that Class Vehicles sold to Plaintiff and other Class Members have "an EPA-estimated 238 miles" on "a full charge" and "offers more than 383 km of range" and "top off your battery as much or as little as you like" are written warranties  within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).[31]

---

[31] https://web.archive.org/web/20171011012928/http:/www.chevrolet.com/bolt-ev-electric-vehicle#charging;
https://web.archive.org/web/20190421140946/https://www.chevrolet.com/previous-year/bolt-ev-electric-car;
https://web.archive.org/web/20180929091633/https://www.chevrolet.com/electric/bolt-ev-electric-car?cmp=OLA_DISPLAY_20519044_211515933_411199255_77369262;
https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2017.html;
https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2018.html;
https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2019.html

144.     Through written and implied warranties, Defendant warranted that the Class Vehicles are free from defects, of merchantable quality, and fit for their ordinary use.

145.     Defendant breached the warranties as described herein. Contrary to Defendant's representation, Plaintiff and other Class Members were subject to the Defect and were faced with the choice of limiting their battery charge to 90% or be subjecting themselves to risk of a potential car fire.  As such, Plaintiff's and other Class Members' Class Vehicles did not perform as promised and unfit and unreasonably dangerous for ordinary use.

146.     Defendant knew, or should have known, of the Battery Defect in the Class Vehicles.

147.     Defendant knew, or should have known, of its misrepresentations and omission regarding the capabilities of the Class Vehicles, yet proceeded with a coordinated advertising campaign through which Defendant promised that the Class Vehicles have "an EPA-estimated 238 miles" on "a full charge" and "offer[s] more than 383 km of range" and that Plaintiff and Class Members can "top off your battery as much or as little as you like."

148.     Plaintiff and Class Members were damaged as a result of the Defendant's breach of warranty, because they received a product incapable of performing the as Defendant represented, and a product unfit and dangerous for its ordinary use, rendering the Class Vehicles less valuable than as represented.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, hereby requests that this Court enter an Order against Defendant providing the following:

A. Certification of the proposed Class, appointment of Plaintiff as representative of the Class and counsel of record as Class Counsel;

B.  Injunctive relief temporarily and permanently enjoining Defendant from continuing to engage in the unlawful conduct alleged herein;

C.  Payment to Plaintiff and Class Members of all out-of-pocket expenses resulting from or arising from the Battery Defect alleged herein;

D.  An award of all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled (including, without limitation, any payments made to Chevrolet dealers to address the Battery Defect);

E.  An award of pre- and post-judgment interest on any amounts awarded;

F.  Any additional appropriate equitable, injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Vehicles and to extend applicable warranties to a reasonable period of time, and to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Battery Defect;

G.  An award of reasonable attorneys' fees, expenses, and costs of suit; and

H.  All such other or further relief as the Court may find to be appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 1, 2020

By:   s/ Ben Barnow

Ben Barnow
Erich P. Schork
Anthony Parkhill
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, Illinois 60606
Telephone: (312) 621-2000
*b.barnow@barnowlaw.com*
*e.schork@barnowlaw.com*
*aparkhill@barnowlaw.com*

Benjamin F. Johns
Beena M. McDonald (*pro hac vice motion forthcoming*)
Samantha E. Holbrook (*pro hac vice motion forthcoming*)
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
*bfj@chimicles.com*
*bmm@chimicles.com*
*seh@chimicles.com*

Steven D. Cohen (*pro hac vice motion forthcoming*)
Susan J. Russell
J. Burkett McInturff (*pro hac vice motion forthcoming*)
**WITTELS MCINTURFF PALIKOVIC**
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
*sdc@wittelslaw.com*
*sjr@wittelslaw.com*
*jbm@wittelslaw.com*

*Attorneys for Plaintiff and the Proposed Class*

37