**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| ANDRES TORRES, THOMAS WHITTAKER, CAROL WHITTAKER, MARY ELIZABETH MCQUARRIE, DESHAWN DICKINSON, GREG FIELD, JOSEPH POLETTI, JAMES KOTCHMAR, ROBERT ALLEN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>GENERAL MOTORS LLC,<br><br>    Defendant. | Case No. 1:20-cv-07109<br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Benjamin F. Johns
Beena M. McDonald
(admitted *pro hac vice*)
Samantha E. Holbrook
(admitted *pro hac vice*)
**CHIMICLES SCHWARTZ KRINER &
  DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
bfj@chimicles.com
bmm@chimicles.com
seh@chimicles.com

Steven D. Cohen
(*pro hac vice* motion forthcoming)
Susan J. Russell
J. Burkett McInturff
(*pro hac vice* motion forthcoming)
**WITTELS MCINTURFF PALIKOVIC**
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
sdc@wittelslaw.com
sjr@wittelslaw.com
jbm@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*
[additional counsel on signature page]

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

PARTIES ..............................................................................................................4

     A.    Plaintiffs ...................................................................................4

     B.    Defendant General Motors..........................................................5

JURISDICTION ...................................................................................................6

VENUE ................................................................................................................6

FACTUAL ALLEGATIONS .................................................................................6

     A.    GM Markets the Chevrolet Bolt By Highlighting
          the Vehicle's 238-Mile Range ...................................................6

     B.    The Chevrolet Bolt Suffers from a Battery Defect that Leads to
          Fire Risk When the Battery Is Fully Charged............................9

     C.    GM's Knowledge of and Insufficient Response to Battery Issues ........12

     D.    Plaintiffs' Experiences with the Chevrolet Bolt .........................18

          Plaintiff Torres (Illinois) ..........................................................18

          Plaintiffs Thomas and Carol Whittaker (Illinois) ..................19

          Plaintiff McQuarrie (California)..............................................21

          Plaintiff Dickinson (California)...............................................22

          Plaintiff Field (Arizona)...........................................................23

          Plaintiff Poletti (Arizona) ........................................................25

          Plaintiff Kotchmar (New York) ...............................................26

          Plaintiff Allen (Arkansas) ........................................................27

     E.    Numerous Other Chevrolet Bolt Owners and Lessees Have
          Complained About the Battery Defect...................................28

      F.     GM Sold and Continues to Sell Class Vehicles with
           Knowledge of the Battery Defect ........................................................34

CLASS ALLEGATIONS ......................................................................................34

ANY APPLICABLE STATUTE OF LIMITATIONS ARE TOLLED .......................38

COUNT I
Breach of Implied Warranty of Merchantability
Violation of ARIZ. REV. STAT. ANN. § 47-2314
(Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)....................................39

COUNT II
Breach of Express Warranty
Violation of ARIZ. REV. STAT § 47-2313
(Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)....................................40

COUNT III
Violation of the Arizona Consumer Fraud Act
ARIZ. REV. STAT. ANN. § 44-1522
(Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)....................................41

COUNT IV
Violation of the Arkansas Deceptive Trade Practices Act
ARK. CODE ANN. § 4-88-101, et seq.
(Plaintiff Allen on Behalf of the Arkansas Subclass) ...................................................42

COUNT V
Violation of the Magnuson-Moss Warranty Act
15 U.S.C. § 2301, et seq. ("MMWA")
(Nationwide Class)........................................................................................44

COUNT VI
Violation of the Song-Beverly Consumer Warranty Act
CAL. CIV. CODE § 1790, et seq.
(Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass) ...............................47

COUNT VII
Violation of the California Unfair Competition Law
CAL. BUS. & PROF. CODE § 17200, et seq. ("UCL")
(Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass) ...............................49

COUNT VIII
Violation of California's Consumer Legal Remedies Act
CAL. CIV. CODE § 1750, et seq. ("CLRA")

(Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass) ...............................53

COUNT IX
Breach of Express Warranty
(Nationwide Class or, alternatively, State Subclasses).................................................................55

COUNT X
Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
815 Ill. Comp. Stat. 505/1, et seq.
(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)...........................................57

COUNT XI
Violation of Illinois Uniform Deceptive Trade Practices Act
815 Ill. Comp. Stat. 510/1, et seq.
(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)...........................................59

COUNT XII
Breach of Implied Warranty of Merchantability
810 Ill. Comp. Stat. 5/2-314 and 810 Ill. Comp. Stat. 5/2A-212
(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)...........................................61

COUNT XIII
Breach of Express Warranty
810 Ill. Comp. Stat. 5/2-313
(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)...........................................62

COUNT XIV
Violations of New York General Business Law § 349
N.Y. GEN. BUS. LAW § 349
(Plaintiff Kotchmar on Behalf of the New York Subclass) ..........................................................63

COUNT XV
Violations of New York General Business Law § 350
N.Y. GEN. BUS. LAW § 350
(Plaintiff Kotchmar on Behalf of the New York Subclass) ..........................................................64

COUNT XVI
Common Law Fraud
(Nationwide Class or, alternatively, State Subclasses).................................................................66

COUNT XVII
Fraudulent Concealment / Fraud by Omission
(Nationwide Class or, alternatively, State Subclasses).................................................................67

COUNT XVIII
Unjust Enrichment
(Nationwide Class or, alternatively, State Subclasses)...................................................69

PRAYER FOR RELIEF ............................................................................................69

Plaintiffs Andres Torres, Thomas Whittaker, Carol Whittaker, Mary Elizabeth McQuarrie, DeShawn Dickinson, Greg Field, Joseph Poletti, James Kotchmar, and Robert Allen ("Plaintiffs") bring this class action lawsuit against General Motors LLC ("GM" or "Defendant") on behalf of themselves and all other similarly situated persons who purchased or leased 2017–2019 model year Chevrolet Bolt EVs (hereafter "Chevrolet Bolt," "Chevy Bolt," "Bolt" or "Class Vehicles"). As described in more detail below, Plaintiffs seek economic damages and other appropriate relief because the Class Vehicles are defective and were deceptively marketed to consumers.

## INTRODUCTION

1.     In early 2016, GM introduced the Chevrolet Bolt, a plug-in, all-electric vehicle. GM rolled out the Bolt in 2017 to compete with similar all-electric vehicles released by Tesla, Nissan, and BMW.[1]

2.     Electric vehicles like the Bolt offer the potential to be relatively environmentally-friendly and provide savings on gas, but these perks come with a trade-off: electric vehicles with a full charge often travel a shorter distance than conventional gas-powered cars with a full tank of gasoline. As such, the driving range of an electric vehicle's battery is one of the most critical factors to consider when purchasing any battery-charged electric vehicle.

3.     GM was well aware of the importance that electric car-buyers placed on an electric car's battery range and marketed the Bolt accordingly. GM touted the Bolt's battery as being "where it all starts" and advertised an energy capacity of 60 kWh, which GM said allowed drivers

---

[1] https://www.wired.com/2016/01/gm-electric-car-chevy-bolt-mary-barra/ (last visited Jan. 10, 2021).

to travel an EPA-estimated 238 miles of range on a full charge.[2] An example of one such advertisement touting the Bolt's battery capabilities appears below.



4.      GM's marketing campaign was successful. The Bolt received the prestigious 2017 Motor Trend Car of the Year accolade as being a "game changer" due in part to the 238 miles the "EPA has certified the [Chevy] Bolt will travel on a full charge.[3] It was similarly awarded titles for the 2017 North American Car of the Year [4] and 2017 Green Car of the Year.[5] These awards touted the Bolt's range and price – "the … Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]."[6]

5.      However, the actual performance of the Bolt falls short of those accolades. Unfortunately for consumers like Plaintiffs, the Class Vehicles suffer from a serious defect that, in order to avoid risk of fire, results in a severe loss of potential battery mileage of the high voltage

---

[2] https://www.dublinchevrolet.com/Chevrolet-Bolt-EV (last visited Nov. 30, 2020); *see also*, https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Jan. 10, 2021).
[3] https://www.motortrend.com/news/chevrolet-bolt-ev-2017-car-of-the-year/ (last visited Jan. 10, 2021).
[4] https://northamericancaroftheyear.org/chevrolet-bolt-chrysler-pacifica-honda-ridgeline-named-2017-north-american-car-truck-and-utility-vehicle-of-the-year/ (last visited Jan. 10, 2021).
[5] https://www.autoblog.com/2016/11/17/chevy-bolt-wins-2017-green-car-of-the-year/ (last visited Jan. 10, 2021).
[6] https://www.hybridcars.com/2017-chevy-bolts-trophy-case-is-filling-up/ (last visited Jan. 10, 2021).

batteries. Specifically, when the high voltage batteries of 2017–2019 model year Bolts are charged to full, or very close to full, they pose a risk of fire (the "Battery Defect").[7]

6.     GM's purported "interim remedy" to reduce the risk of fire is a software update that limits the maximum state of charge to approximately 90% battery capacity (or less), thereby reducing the mileage that these vehicles can otherwise travel on a full charge. To achieve this "remedy," Bolt owners and lessees must schedule a service appointment with their local Chevrolet dealership to apply a software update to change the vehicle charge settings. Until such time that the Bolt owner or lessee is able to get a service appointment at their Chevrolet dealership, the vehicle software allows the driver to modify the battery settings on the vehicle in order to limit the battery charge to 90%.

7.     Despite being aware of serious battery problems with the Bolt, GM failed to inform prospective Bolt owners and lessees that the vehicle is plagued with this dangerous Battery Defect. Accordingly, owners and lessees of the Class Vehicles are forced to decide between the risk of a potentially fatal car fire or acquiesce to GM's interim remedy which results in a significant loss in vehicle range. Prior to revealing the Battery Defect to Bolt owners and lessees in November 2020, GM had for years been encouraging consumers to charge their batteries to 100% as a regular practice, a practice that apparently would have led customers to face an increased fire risk.

8.     Plaintiffs brings this class action lawsuit on behalf of themselves and a class of similarly situated consumers who have purchased or leased one or more of the Class Vehicles (the "Class" or "Class Members").

9.     Plaintiffs and the Class seek redress for GM's violations of the Illinois Consumer Fraud and Deceptive Practices Act, Illinois Uniform Deceptive Trade Practices Act, the Arizona

---

[7] https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited Jan. 10. 2021).

Consumer Fraud Act, the Arkansas Deceptive Trade Practices Act, the Magnuson-Moss Warranty Act, the Song-Beverly Consumer Warranty Act, the California Unfair Competition Law, California's Consumer Legal Remedies Act, the New York General Business Law, fraudulent concealment/fraud by omission, GM's breaches of express and implied warranties, and GM's unjust enrichment.

10.    Plaintiffs and the Class seek actual damages, restitution, and equitable relief, as well as statutorily-permitted reasonable attorneys' fees and costs of suit and pre- and post-judgment interest for GM's misconduct related to the design, manufacture, marketing, sale, and lease of Chevrolet Bolts. Plaintiffs and the Class also seek punitive damages as a result of GM knowingly introducing defective Class Vehicles into the marketplace and defrauding consumers across the nation.

## PARTIES

### A.    Plaintiffs

11.    Plaintiff Andres Torres is an adult individual who resides in Bolingbrook, Illinois. In or around August 2019, Plaintiff Torres purchased a used 2017 Chevy Bolt from a dealership in Downers Grove, Illinois, an authorized GM retailer.

12.    Plaintiff Thomas Whittaker is an adult individual who resides in Round Lake, Illinois. In or around June 2017, Plaintiff Whittaker purchased a new 2018 Chevy Bolt from a dealership in Lake Forest, IL, an authorized GM retailer. Plaintiff Carol Whittaker is Mr. Whittaker's wife and is the primary user of that 2018 Chevy Bolt.

13.    Plaintiff Mary Elizabeth McQuarrie is an adult individual who resides in Cambria, California. In or around November 2018, Plaintiff McQuarrie purchased a new 2019 Chevy Bolt from a dealership in Paso Robles, California, an authorized GM retailer.

14.     Plaintiff DeShawn Dickinson is an adult individual who resides in Lancaster, California. In or around November 2020, Plaintiff Dickinson purchased a used 2017 Chevy Bolt from a dealership in Lancaster, California, an authorized GM retailer.

15.     Plaintiff Greg Field is an adult individual who resides in Tempe, Arizona. In or around July 2019, Plaintiff Field purchased a 2017 Chevy Bolt from a dealership in Tempe, Arizona, an authorized GM retailer.

16.     Plaintiff Joseph Poletti is an adult individual who resides in Chandler, Arizona. In or around June 2018, Plaintiff Poletti purchased a 2018 Chevy Bolt from a dealership in Gilbert, Arizona, an authorized GM retailer.

17.     Plaintiff James Kotchmar is an adult individual who resides in Thiells, New York. In or around September 2017, Plaintiff Kotchmar purchased a new 2017 Chevy Bolt from a dealership in Nanuet, New York, an authorized GM retailer.

18.     Plaintiff Robert Allen is an adult individual who resides in Dover, Arkansas.  In or around April 2018, Plaintiff Allen purchased a 2018 Chevy Bolt from a dealership in Little Rock, Arkansas, an authorized GM retailer.

**B.     <u>Defendant General Motors</u>**

19.     Defendant GM is a limited liability company organized under Delaware law with its principal office located at 300 Renaissance Center, Detroit, Michigan 48265. Defendant designs, tests, markets, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including but not limited to Chevrolet, Buick, GMC, and Cadillac in this district and throughout the United States.

## JURISDICTION

20.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) at least one Class Member is a citizen of a different state than Defendant. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendant because it is present, licensed to conduct business, and does conduct business regularly in this District; and Defendant has sufficient contacts with this District.

## VENUE

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business in this District, including sales and advertising, and Defendant is subject to personal jurisdiction in this District. Additionally, a substantial part of the events and/or omissions giving rise to Plaintiff Torres' and the Whittaker Plaintiffs' claims occurred within this District.

## FACTUAL ALLEGATIONS

**A.     GM Markets the Chevrolet Bolt By Highlighting the Vehicle's 238-Mile Range**

23.     The Chevrolet Bolt is a front-motor, five-door, all-electric small hatchback. A picture of the 2017 Chevrolet Bolt is below:



24.     Since its release, approximately 94,958 Chevy Bolts have been sold worldwide. They are available for purchase in the United States, South Korea, Mexico, and Canada.[8]

25.     In addition to price, a core consideration for electric vehicle purchasers and lessees are the capacity and range of the car battery. Because charging stations are not as easily located and ubiquitous as gas stations, an electric vehicle's usefulness depends in large part on the distance the vehicle can travel before needing a recharge. Electric car buyers rely on the manufacturer's representations about an electric vehicle's ability to travel on a single charge.

26.     Car and Driver describes range as "the all-important stat."[9] Because electric vehicles "can't be driven nearly as far on a single charge as most gas-powered cars can go on a tank of fuel[] [a]nd [because electric vehicle] batteries can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station," increased range is one of the primary consideration for purchasers or lessees or electric vehicles. (*Id.*)

27.     GM was aware of these battery capacity and range considerations when marketing the Bolt. GM touted the battery as "where it all starts" and as making it possible to get drivers to

---

[8] *See* https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last visited Jan. 10, 2021).
[9] https://www.caranddriver.com/shopping-advice/a32668797/ev-faqs/ (last visited Jan. 10, 2021).

the places they need to go.[10] GM touted the Class Vehicles as having a battery capacity of 60 kWh which would result in an EPA-estimated travel range of 238 miles without recharging. GM has maintained these representations since it began marketing the Class Vehicles to the general public.

28.    GM published this estimated travel range in several places, including in a GM specifications sheet disclosing that the vehicle was able to maintain a driving range of an "EPA-estimated 238 miles" and a "product information" fact sheet regarding the 2017 Bolt that confirmed "an EPA-estimated 238 miles of range." (*Id.*)

29.    GM marketed the driving range as one of the Chevrolet Bolt's main selling points in its national advertising campaign. GM issued a press release in September 2016, saying that "[w]ith the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV . . . ."[11]

30.    Below is a screen captures from a 2017 GM commercial about the Bolt:



[12]

---

[10] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.tab1.html (last visited Jan 10, 2021).

[11] *See* https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/sep/0913-boltev.html (last visited Jan. 18, 2021)

[12] *See* https://www.youtube.com/watch?v=uVIedKsm-Kg (screen capture at 3:20) (last visited Jan. 10, 2021).

31.     GM went to great lengths to prove that 238-mile range, including taking a *Car and Driver* writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."[13]

32.     After making its initial deliveries of the 2017 Bolt to its very first customers at the end of 2016, GM issued a press release that quoted a California customer who replaced a competing electric car model: "The range and technology attracted me to the Bolt. . . . I look forward to the longer drives I can make compared to the [BMW] i3 that I owned."[14]

33.     GM made these same or similar representations about the 2018 and 2019 model Chevrolet Bolt, again marketing the vehicle as having an alleged EPA-estimated range of 238 miles.[15]

**B.      The Chevrolet Bolt Suffers from a Battery Defect that Leads to Fire Risk When the Battery Is Fully Charged**

34.     Lithium-ion batteries, such as the one used in the Chevrolet Bolt, are a key component of electric vehicles due to their high energy efficiency, high power, and long life cycle.[16]

---

[13] *See* https://www.caranddriver.com/reviews/a15099295/2017-chevrolet-bolt-ev-first-drive-review/ (last visited Jan. 10, 2021).

[14] *See* https://plants.gm.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/dec/1213-boltev.html (last visited Jan. 22, 2021).

[15] *See* https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.tab1.html; https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2018.html; https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2019.html (last visited Jan. 10, 2021).

[16] *See* https://afdc.energy.gov/vehicles/electric_batteries.html#:~:text=Lithium%2DIon%20Batteries,-Lithium%2Dion%20batteries&text=They%20also%20have%20a%20high,%2C%20and%20low%20self%2Ddischarge.&text=Most%20of%20today's%20PHEVs%20and,that%20of%20consumer%20electronics%20batteries (last visited Jan. 10, 2021).

35.     LG Chem, a subsidiary of LG, designed and produced the Bolt battery at its South Korea facility.

36.     Chevrolet Bolt drivers rely on the capacity and safety of the lithium-ion batteries, which serve as the Bolt's sole power source.

37.     However, unbeknownst to Plaintiffs and the Class, the Battery Defect renders the battery susceptible to catching fire when fully charged. Rather than inform consumers about the existence of this Battery Defect at the time of purchase, GM instead encouraged Bolt owners to "top off your battery as much or as little as you like."[17]

38.     Indeed, in a Facebook Q&A in October of 2019, Adam Piper, Energy Performance Engineer at GM, dispelled rumors that Bolt owners should avoid charging their batteries to 100%, stating: "We engineered the battery system so that you can charge to 100% and maximize range. Do whatever is best for your personal circumstances. If you want maximum range, charge to 100%."[18]

39.     GM made this recommendation despite its knowledge of the inherent fire risk in doing so. Indeed, a fire incident with a fully-charged battery had already been recorded seven months earlier in March 2019 and submitted to the National Highway Traffic Safety Administration ("NHTSA") in July 2019.[19]

---

[17] https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Jan. 10, 2021).
[18] *See* Birkett, Steve, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, Torque News (Oct. 31, 2019), available: https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last visited Jan. 20, 2021).
[19] *See* Shepardson, David, *U.S. safety agency probes vehicle fires in Chevy Bolt EVs*, YAHOO!NEWS (Oct. 13, 2020), available: https://news.yahoo.com/u-safety-agency-probes-vehicle-150303216.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAALjN2xpuXVbdzJH58NPaDupnZuOtIXbqGaFQ-AHsO0ka35OG78A8iEt6WiAF5FLJuwpjBckzpuu0Fg0FP899Wdj8DXEd1zajvW-

40.     More than a year-and-a-half after that fire incident, on November 13, 2020, GM informed all of its authorized retailers of its intent to recall 68,667 Chevrolet Bolt EV vehicles—over 50,000 of which are in the United States—equipped with design-level N2.1 batteries produced at LG Chem's South Korea plant. GM said that the battery pack posed a risk of fire when charged to full or near-full capacity.

41.     In that interim period from March 2019, when the first fire incident was apparently reported, through November 2020 when GM first made a public recall announcement, multiple Plaintiffs, including Plaintiff Torres and many Class Members, purchased new or used Bolts that would ultimately be impacted by the recall.

42.     All Class Vehicles are affected by the recall. Curiously, the 2020 model year Chevrolet Bolt EVs do not have this same issue because they reportedly "use a different battery-cell design than the vehicles affected by this recall."[20] The fact that GM switched to a different battery-cell design beginning with the 2020 model year cars is further evidence that GM was aware that battery problems existed with the 2017–2019 model year Bolts.

43.     But rather than issue a complete recall of the vehicles to replace the dangerous batteries with the batteries used in the 2020 and later model year Bolts, GM informed the NHTSA that the purpose of the recall is to instead install an interim software remedy to reprogram the hybrid propulsion system control module to reduce the battery's charge capacity by 10%.

_____

58NR1DsxEQhTMVUB1kqbm5xQSG9soizMPZtq2hCysMsDwf0O4ugGELDXw5s--WvnSLsHu2njj (last visited Jan. 19, 2021).

[20] *See* Brown, Laura, *50,000 Chevy Bolt EVs Recalled; Owners Told Not to Park in Garages, Near Houses* (Jan. 10, 2021), available: https://www.caranddriver.com/news/a34672772/chevrolet-bolt-ev-recall-battery/ (last visited Jan. 10, 2021).

44.     GM recommends that Class Vehicle owners schedule a service appointment with their local dealerships to update the vehicle's battery software to automatically limit the maximum state of charge to approximately 90% battery capacity. For Class Vehicle owners who have not yet done so, GM recommends that those owners or lessees should not park their car in their garage or carport until after they have visited their local dealership and, in the interim, modify their car software to lower the maximum battery charge to 90%.

45.     Class Vehicle owners are thus faced with a Hobson's choice: either do nothing and risk a potentially fatal car fire, or install a temporary software update which significantly diminishes the life of the car battery, resulting in reduced driving range of 10% or more.

46.     GM has been aware of the defects in its battery management system and battery cell imbalances since at least 2017. Nonetheless, GM has sold and leased and continues to sell and lease Class Vehicles with the knowledge that they contain defective and potentially dangerous batteries.

C.     **GM's Knowledge of and Insufficient Response to Battery Issues**

47.     The Chevrolet Bolt has long been plagued with battery-related problems and GM has been aware of battery-related problems for years.

48.     In December 2016, GM issued a quality improvement program entitled "Bolt EV (BEV2) High Voltage Battery Exchange and Internal Parts Process" which listed steps to determine whether components of the high voltage battery pack needed replacement.[21]

49.     On or around April 2, 2018, GM issued a notice for Bolt drivers to go to their dealership for a software update to provide more warning about any potential "cell low-voltage condition" and reduced propulsion. Without the update, the Bolt software would not provide

---

[21] *See* https://static.nhtsa.gov/odi/tsbs/2018/MC-10141375-9999.pdf (last visited Jan. 22, 2021).

drivers with sufficient warnings prior to a battery cell low range condition that would or could result in a loss of propulsion.[22]

50. GM issued an additional statement on May 11, 2018 providing additional warnings and asking all Bolt customers to schedule a service appointment to receive the latest software which would "provid[e] more warning at low states of charge."[23]

51. In August 2018, GM disclosed that "Certain 2017-2018 model year Bolt EV vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion. Only certain vehicles will experience the battery low voltage cell condition."[24]

52. Although GM described this issue publicly as a mere "software" problem, according to Plaintiffs' expert's review of contemporaneous documents generated by GM, the underlying issue was that the battery cells in the vehicle had inconsistent capacities, thereby not providing the full expected range.

53. Tim Grewe, GM's chief engineer of electric propulsion systems, publicly acknowledged battery issues resulting from LG Chem's practices.[25] Although GM indicated in public that the problem was relatively isolated, Plaintiffs' expert finds reason to believe that the problem was more widespread and that it served as a red flag concerning the Bolt's battery. Indeed,

---

[22] *See* https://static.nhtsa.gov/odi/tsbs/2018/MC-10143682-9999.pdf (last visited Jan. 22, 2021).
[23] *See* https://insideevs.com/news/337521/update-possible-chevy-bolt-battery-cell-failure-prompts-gm-statement-recall/ (last accessed Jan. 10, 2021).
[24] *See* https://static.nhtsa.gov/odi/tsbs/2018/MC-10145176-9999.pdf (last visited Jan. 10, 2021).
[25] *See* https://insideevs.com/news/342671/my-chevy-bolt-is-on-third-battery-pack-heres-why/ (last visited Jan. 10, 2021).

despite GM's public indications that it was a narrow "software" issue, GM recalled all 2017–2018 model year Bolts for modification.

54.     Despite the fact that a battery fire had occurred in March 2019, GM only first launched an internal investigation beginning August 2020.[26] GM did not alert customers at the time that it was conducting that investigation.

55.     Indeed, despite its years-long knowledge of battery issues with the Chevy Bolt batteries developed by LG Chem, GM failed to notify Plaintiffs and members of the Class of the associated Battery Defect at the time of purchasing their Class Vehicles. Instead, GM did not perform its recall until several fires occurred in the Class Vehicles, delaying the recall to avoid the financial ramifications of having to acknowledge that its Class Vehicles and car batteries were inherently defective by design and incapable of safely providing customers with GM's advertised 238-mile driving range.

56.     GM actively concealed the fact that its representations regarding the Class Vehicle's battery range were false, based on unreasonable usage of the battery at maximum capacity which would create a real fire risk. GM withheld the fact that the existence of the Battery Defect would diminish car owners' usage of the Class Vehicles and would also depreciate their vehicle's intrinsic and resale value.

57.     GM publicly announced the Battery Defect in the form of a recall on November 13, 2020.[27] GM Recall number N202311730 revealed, in pertinent part, that "GM has decided that a

---

[26] *See* McEachern, Sam, *2019 Chevrolet Bolt EV Fire To Be Investigated By General Motors*, GM Authority (Aug. 27, 2020), available: https://gmauthority.com/blog/2020/08/2019-chevrolet-bolt-ev-fire-to-be-investigated-by-general-motors/ (last visited Jan. 22, 2021).
[27] *See* https://my.gm.com/recalls?vin=1G1FX6S07J4120452&evar36=eml_monthly_onstar_OVD&vels=662483105 (last visited Jan. 10, 2021).

defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles … that may pose a risk of fire …. GM has developed software that will limit vehicle charging to 90% of full capacity….”

| GM Recall #: | NHTSA # | Date Issued: |
| --- | --- | --- |
| N202311730 | 20V701 | Nov 13, 2020 |

**Recall Title:**

High Voltage Battery May Melt or Burn

**Recall Description:**

General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles. A select number of these vehicles were built with high voltage batteries produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity. While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk.

**Safety Risk Description:**

If the batteries in select vehicles within this population are charged to full capacity, or very close to full capacity, the batteries may pose a risk of fire.

**Repair Description:**

As an interim remedy, dealers will reprogram the hybrid propulsion control module 2 (HPCM2) to limit full charge to 90%.

**Customer Action:**

For more information, customers can visit www.chevy.com/boltevrecall or contact the Chevrolet EV Concierge 1-833-EVCHEVY or their preferred dealer.

**Recall Status:** INCOMPLETE

58. An "Important Safety Recall" notice was mailed to Bolt owners and lessees in November 2020:

Chevrolet
P.O. Box 909989
Milwaukee, WI 53209 9980

IMPORTANT SAFETY RECALL

N202311730 [redacted] 13 0004649
[redacted]

November 2020

This notice applies to your vehicle, **VIN:** [redacted]

Dear [redacted]

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017-2019 model year Chevrolet Bolt EV vehicles. As a result, GM is conducting a safety recall. We apologize for this inconvenience. However, we are concerned about your safety and continued satisfaction with our products.

IMPORTANT

- Your vehicle is involved in GM recall N202311730.
- Beginning on November 17, 2020, please schedule an appointment with your Chevrolet dealer.
- This service will be performed for you at **no charge.**
- **This letter also contains important interim charging instructions for your vehicle. Please review these instructions before charging your vehicle.**

**Why is your vehicle being recalled?** A certain number of these vehicles were built with high voltage cells produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity.

**What will we do?** While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk. This software will be available at your Chevrolet dealer on November 17, 2020. Your Chevrolet dealer will reprogram your vehicle's hybrid propulsion control module to limit full charge to 90%. This service will be performed for you at **no charge.** Because of service scheduling requirements, it is likely that your dealer will need your vehicle longer than the actual inspection and service correction time of approximately 25 minutes.

GM

We are working around the clock on our continued investigation and we intend to deploy a final remedy and remove the 90% limitation as soon as possible after the first of the year. When that remedy is available, we will send you another letter asking you to take your vehicle to your Chevrolet dealer to have your vehicle serviced, free of charge.

**What should you do?** Beginning on November 17, 2020, you should contact your Chevrolet dealer to arrange a service appointment as soon as possible. Until your vehicle's battery system has received the updated software, you should take one of the following interim steps:

**(Model Years 2017-18 Only):** Activate the Hill Top Reserve feature in your vehicle. This feature, when activated, will limit your vehicle's battery to 90% of full capacity. For assistance activating this feature, please watch the instructional video at www.chevy.com/boltevrecall.

**(Model Year 2019 Only):** Activate the Target Charge Level feature in your vehicle, and set the target-charge level to 90%. For assistance activating this feature, please watch the instructional video at www.chevy.com/boltevrecall.

**(All Model Years):** If you are unable or uncomfortable enabling one of the above described charge-limiting features in your vehicle, you should park your vehicle outside as soon as your vehicle completes a full battery charge.

**Do you have questions?** If you have questions or concerns that your dealer is unable to resolve, please contact the Bolt EV Concierge team at 833-EVCHEVY (833-382-4389). Hours of operation are Monday through Friday, 8:00 AM to 7:00 PM ET.

If after contacting your dealer and the Customer Assistance Center, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 20V701.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

Maryann L. Combs
Vice President
Global Vehicle Safety

GM Recall N202311730



59. GM also emailed a notice entitled "Important safety information regarding your Chevrolet Bolt EV" to Bolt owners and lessees in November 2020:

From: **Chevrolet** <Your_Chevrolet_Team@emails.chevrolet.com>
Date: Fri, Nov 13, 2020 at 5:02 PM
Subject: Important safety information regarding your Chevrolet Bolt EV
To: <[redacted]

CHEVROLET

For more information, visit **Chevy.com/boltevrecall ›**

[redacted]

As you may be aware, the National Highway Traffic Safety Administration (NHTSA) launched an investigation into a few reports the agency received from Chevrolet Bolt EV owners about potential fires. GM had already been investigating these reports prior to that announcement, in cooperation with NHTSA.

We wanted you to hear directly from Chevrolet about your vehicle and what you can expect from us. General Motors and Chevrolet have decided to voluntarily recall select 2017 – 2019 model-year Chevrolet Bolt EVs with high voltage batteries produced at LG Chem's Ochang, South Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity.

The safety of our products is the highest priority for the entire GM and Chevrolet teams. We are working around the clock on our continued investigation.

We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90%, and reduce the risk of fire.

**For your 2017 model-year Bolt EV:**

- Change the vehicle charge settings to use the Hill Top Reserve option

For instructions on how to activate these settings, please view the video at our website: **Chevy.com/boltevrecall ›**

If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

We recommend scheduling a service appointment with your dealership beginning November 17th to update the vehicle's battery software to automatically limit the maximum state of charge to 90%. Our engineers are working around the clock to identify a permanent fix and we intend to deploy a final remedy to remove the 90% limitation as quickly as possible after the first of the year, 2021.

**For More Information:**

1. Visit us online at **www.chevy.com/boltevrecall ›**
2. Contact our dedicated customer support team, Chevrolet EV Concierge, at 1-833-EVCHEVY — available Monday through Friday from 8:00 a.m. – 7:00 p.m. EST
3. Contact your preferred Chevrolet EV dealer

We apologize for this inconvenience and are committed to finding a final solution to this issue as soon as possible.

Steve Hill
U.S. Vice President, Chevrolet

60. A "Bolt EV Safety Recall" sheet was also mailed to Class Members in December 2020 in English and Spanish:



61.     As shown in the above communications from GM, instead of offering owners a full recall to completely replace the defective battery, GM only instituted a software update, a mere band-aid to provide a less than suitable temporary remedy for a significant and potentially dangerous defect.

62.     Specifically, the only "remedy" provided by GM at this time is a software update that results in reducing the range of Class Vehicles by 10% or more below what was advertised.

63.     This can hardly be said to be an upgrade at all; if anything, it only adds to the "range anxiety" that Chevrolet Bolt owners already have – the deep-seated fear of many electric vehicle drivers that their vehicle will not have sufficient mileage or power to get them from point A to point B safely.[28] It also requires additional charging time, maintenance, and expense for Bolt owners and lessees.

64.     Accordingly, Bolt owners and lessees have been deprived of the benefit of their bargain when they purchased or leased their Bolts.

65.     Had GM disclosed the Battery Defect, customers would have been made aware of it, and would not have purchased their Bolt vehicles or would have paid substantially less for them. Instead, GM remained silent.

66.     While "GM said it understands owners could be upset about **their cars not being fully functional**," it will only "address complaints on a case-by-case basis."[29] Plaintiffs are unaware of any specific legitimate measures taken by GM to actually fix the underlying battery issue other than modifying the vehicle's software to reduce the battery's charging capacity. While

---

[28] *See* Brooks, Allen, *EV "Range Anxiety": Real World Issues*, MasterResource (July 10, 2017), available:  https://www.masterresource.org/electric-vehicles/ev-batteries/ (last visited Jan. 10, 2021).

[29] https://abcnews.go.com/Technology/wireStory/gm-recalling-69k-bolt-electric-cars-due-fire-74194714 (last visited Jan. 10, 2021) (emphasis added).

GM has said since November 2020 in public forums and to Bolt owners and lessees that it was looking to introduce a more permanent fix after January 1, 2021, there has been no further announcement as to what that permanent battery fix might be or when it might be coming. GM has provided no indication that it is willing to replace the defective batteries for all Class Vehicles.

67.     Upon information and belief, no further remedial measures have been taken and GM has yet to provide Plaintiffs and Class Members with a permanent solution to remedy the Battery Defect.

68.     GM's knowledge of the Battery Defect and its subsequent inaction has resulted in harm to Plaintiffs and Class members.

**D.     Plaintiffs' Experiences with the Chevrolet Bolt**

69.     Plaintiffs' experiences with their Class Vehicles are in line with countless other Chevrolet Bolt owners' and lessees' complaints about and experiences with this vehicle.

**Plaintiff Torres**
**(Illinois)**

70.     In or around August 2019, Plaintiff Torres purchased a used 2017 Chevrolet Bolt (VIN: 1G1FX6S02H4184134) from an authorized dealership in Downers Grove, Illinois.

71.     Plaintiff Torres purchased his Chevrolet Bolt as a pleasure vehicle, but also to commute to work, which is a 162-mile roundtrip door-to-door from his home in Bolingbrook, Illinois to his employer in Kenosha, Wisconsin. His wife and his daughter occasionally drive the car as well.

72.     Plaintiff Torres made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, particularly considering his long commute to work.

73.     Prior to buying his Bolt, GM did not inform Plaintiff Torres of the Battery Defect. Plaintiff Torres reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

74.     After Plaintiff Torres was notified about the recall on or around November 13, 2020, within two weeks, he brought his 2017 Chevrolet Bolt to the local dealership for the software modification.

75.     After his dealership installed the software modification, the estimated range on Plaintiff Torres's car declined and was drastically less than the range of 238 miles that Plaintiff Torres expected he would be getting when he purchased his vehicle.

76.     The software patch installed on Plaintiff Torres's vehicle reduced the range of the vehicle. As a result, Plaintiff Torres began to develop range anxiety on his commute due to the reduced range. At his own expense, he installed an electric car charger at his office in order to ensure that he would have sufficient vehicle range to navigate his commute.

77.     When Plaintiff Torres purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

78.     Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Torres would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

### Plaintiffs Thomas and Carol Whittaker
### (Illinois)

79.     In or around June 2017, Plaintiff Thomas Whittaker purchased a new 2017 Chevrolet Bolt (VIN: 1G1FX6S02H4146709) from an authorized dealership in Lake Forest, Illinois.

80.     Plaintiff Thomas Whittaker purchased the Chevrolet Bolt as a vehicle primarily for his wife Carol's use, including for her 54-mile commute to work.

81.     The Whittakers made their decision to purchase the Chevrolet Bolt after considering other electric car models based on GM's representations about the vehicle, including the reported 238-mile range.

82.     Prior to buying his Bolt, GM did not inform the Whittakers of the Battery Defect. The Whittakers reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

83.     After the Whitakers were notified about the recall, they brought the 2017 Chevrolet Bolt to the local dealership to receive the software modification.

84.     After the dealership installed the software modification, the estimated range on the Whittakers' car declined and fell far below the 238 mile range that the Whittakers expected they'd be getting when they purchased his vehicle. Ms. Whittaker has begun to develop range anxiety. At their own expense, the Whittakers had to install a home electric car charger to account for the reduced range so that Ms. Whittaker could complete her commute without running out of power.

85.     When the Whittakers purchased the Chevrolet Bolt, however, they were not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce the vehicle's range and battery capacity.

86.     Had GM disclosed the defect in the Bolt's battery causing a lower range for a full charge or the battery's propensity to catch fire, the Whittakers would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**Plaintiff McQuarrie**
**(California)**

87.     In or around November 30, 2018, Plaintiff McQuarrie purchased a new 2019 Chevrolet Bolt (VIN: 1G1FZ6S01K4113217 from an authorized dealership in Paso Robles, California.

88.     Plaintiff McQuarrie purchased her Chevrolet Bolt for periodically commuting to work, which is a 185-mile round trip door-to-door from her home in Cambria, California to her employer in San Jose, California.

89.     Plaintiff McQuarrie made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, particularly considering her long commute to work. Additionally, owning an electric car in California permits vehicle owners to drive in designated HOV lanes in the Bay Area, something Plaintiff McQuarrie felt would greatly improve her commute time.

90.     Prior to buying her Bolt, GM did not inform Plaintiff McQuarrie of the Battery Defect. Plaintiff McQuarrie reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

91.     After Plaintiff McQuarrie was notified about the recall on or around November 13, 2020, she set the target charge level of her battery at 90% consistent with GM's recommendations.

92.     After setting the target charge level at 90%, the estimated range on Plaintiff McQuarrie's car declined and was drastically less than the range of 238 miles that Plaintiff McQuarrie expected she would be getting when he purchased his vehicle.

93.     Plaintiff McQuarrie now has range anxiety while driving due to the reduced range after setting the target charge level to 90%, which is a major concern for her. She can no longer drive her car during her standard commute, for example, on just one charge.

94.     When Plaintiff McQuarrie purchased her Chevrolet Bolt, however, she was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce her vehicle's range and battery capacity.

95.     Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff McQuarrie would not have purchased the Chevrolet Bolt.

**Plaintiff Dickinson**
**(California)**

96.     On November 6, 2020, Plaintiff Dickinson purchased a used 2017 Chevrolet Bolt (VIN: 1G1FX6S0H4182466) from an authorized dealership in Lancaster, CA.

97.     Plaintiff Dickinson made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, particularly GM's reputation for manufacturing quality electric cars.

98.     Prior to buying his Bolt, GM did not inform Plaintiff Dickinson of the Battery Defect. Plaintiff Dickinson reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

99.     After Plaintiff Dickinson was notified about the recall on or around November 13, 2020, he took his vehicle into his local authorized dealership on December 1, 2020 to have the update installed.

100.    After installing the software modification, the estimated range on Plaintiff Dickinson's car declined fell to far less than the range of 238 miles that Plaintiff Dickinson expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%.

101.    Only a few days following the last visit, Plaintiff Dickinson brought his vehicle back to the dealership. The technician accessed the vehicle after being informed by Plaintiff of the battery range capacity being even lower than the amount stated in GM's recall paperwork. As a result, the technician stated that the only solution would be to reset the vehicle's charging system, but stated that the battery capacity would remain at 80%.

102.    When Plaintiff Dickinson purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

103.    Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Dickinson would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**Plaintiff Field**
**(Arizona)**

104.    In or around July 2019, Plaintiff Field purchased a used 2017 Chevrolet Bolt (VIN: 1G1FW6S0XH4178908) from an authorized dealership in Tempe, Arizona.

105.    Plaintiff Field purchased his Chevrolet Bolt for commuting to work, as his work requires him to drive hundreds of miles a week.

106.    Plaintiff Field made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range.

107.    Prior to buying his Bolt, GM did not inform Plaintiff Field of the Battery Defect. Plaintiff Field reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

108.    After Plaintiff Field was notified about the recall on or around November 23, 2020, he took his vehicle into his local authorized dealership that same day to have the update installed.

109.    After installing the software modification, the estimated range on Plaintiff Field's car declined and fell far below the range of 238 miles that Plaintiff Field expected he would be getting when he purchased his vehicle.

110.    Plaintiff Field now has range anxiety on his long drives for work due to the reduced range after the software update, which is a major concern for him. He cannot run as many appointments for his job due to the reduced range, decreasing his job efficiency and earning potential.

111.    When Plaintiff Field purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

112.    Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Field would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**Plaintiff Poletti**
**(Arizona)**

113.    In or around June 2, 2018, Plaintiff Poletti purchased a new 2018 Chevrolet Bolt (VIN: 1G1FX6S03J4114714) from an authorized dealership in Gilbert, Arizona.

114.    Plaintiff Poletti made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

115.    Prior to buying his Bolt, GM did not inform Plaintiff Poletti of the Battery Defect. Plaintiff Poletti reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

116.    After Plaintiff Poletti was notified about the recall on or around December 1, 2020, he took his vehicle into his local authorized dealership on December 7, 2020 to have the update installed.

117.    After installing the software modification, the estimated range on Plaintiff Poletti's car declined and fell far below the range of 238 miles that Plaintiff Poletti expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%. Plaintiff Poletti's vehicle is also now taking two to three times longer to charge.

118.    Plaintiff Poletti now has range anxiety on his commute to work due to the reduced range after the software update, which is a major concern for him.

119.    When Plaintiff Poletti purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

120.     Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Poletti would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**Plaintiff Kotchmar**
**(New York)**

121.     In or around September 2017, Plaintiff Kotchmar purchased a new 2017 Chevrolet Bolt (VIN: 1G1FW6S09H4149268) from an authorized dealership in Naunet, New York.

122.     Plaintiff Kotchmar purchased his Chevrolet Bolt for economic reasons. He has solar panels installed on his property, allowing him to easily recharge his vehicle daily before his commute to work or running errands. There is no added cost involved for him to refuel his vehicle in this manner.

123.     Plaintiff Kotchmar made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range.

124.     Prior to buying his Bolt, GM did not inform Plaintiff Kotchmar of the Battery Defect. Plaintiff Kotchmar reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

125.     After Plaintiff Kotchmar was notified about the recall in or around November 2020, he took his vehicle into his local authorized dealership on around November 10, 2020 to have the update installed.

126.     After installing the software modification, the estimated range on Plaintiff Kotchmar's car declined and fell far below the range of 238 miles that Plaintiff Kotchmar expected he would be getting when he purchased his vehicle.

127.    Plaintiff now has range anxiety whenever he drives the car due to the reduced range, which is a major concern for him. He can no longer drive his car reliably on one charge anymore.

128.    When Plaintiff Kotchmar purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

129.    Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Kotchmar would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

**Plaintiff Allen**
**(Arkansas)**

130.    In or around April 2018, Plaintiff Allen purchased a new 2018 Chevrolet Bolt (VIN: 1G1FX6SO8J4118421) from Bale Chevrolet in Little Rock, Arkansas.

131.    Plaintiff Allen made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

132.    Prior to buying his Bolt, GM did not inform Plaintiff Allen of the Battery Defect. Plaintiff reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

133.    After Plaintiff Allen was notified about the recall in or around mid-November, he set the battery capacity to hilltop reserve because his Chevrolet dealership is about a 200-mile round trip from his house.

134. After setting the battery capacity to hilltop reserve, the estimated range on Plaintiff Allen's car declined and was less than the range of 238 miles that Plaintiff Allen expected he would be getting when he purchased his vehicle.

135. Plaintiff Allen now has a limited range and with the combination of colder weather and enforced battery capacity, his range has lowered quite a bit.

136. When Plaintiff Allen purchased his Chevrolet Bolt, however, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

137. Had GM disclosed the defect in its battery causing a lower range for a single charge or the battery's propensity to catch fire, Plaintiff Allen would not have purchased the Chevrolet Bolt or would have paid substantially less for it.

## E.    Numerous Other Chevrolet Bolt Owners and Lessees Have Complained About the Battery Defect

138. Plaintiffs' experiences are neither unique nor isolated. Defendant's defective Chevrolet Bolt has drawn the attention and ire of consumers around the country, with countless angry customers voicing their discontent regarding their vehicles and the response (or lack thereof) by GM.

139. A small sample of the countless consumer complaints and negative reviews about the Battery Defect are reproduced below [all *sic*]:

  a.    NHTSA
  - October 30, 2020 NHTSA ID NUMBER: 11372429

    Incident Date October 21, 2020

    IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, WE WERE WOKEN UP BY SMOKE/FIRE ALARMS. WE STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF SEARCHING INSIDE THE HOME AND

FINDING NOTHING, WE REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING FROM THE GARAGE AND WHEN THE MUDROOM DOOR WHICH LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT THE CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE IN THE GARAGE. THE CHEVY BOLT WAS PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT , AS HAS BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8 MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION, EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE INVESTIGATION.[30]

---

[30] *See* https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%2520EV/5%2520HB/FWD (last visited Nov. 30, 2020).

- October 16, 2020 NHTSA ID NUMBER: 11364692

Incident Date October 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED
TO SMOKE FROM UNDER THE CAR. THE SOUND OF
POPPING NOISES WERE HEARD AND THEN 10 MINUTES
LATER THE CAR WAS ENGULFED IN FLAMES. THE CARS
BATTERY PACK STARTING POPPING THEN EXPLODED IN
FLAMES.[31]

- July 17, 2020 NHTSA ID NUMBER: 11339878

Incident Date July 4, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND
DRIVEN FOR 12 MILES TO OUR DESTINATION, A
TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR
OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED
IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR
RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT
HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT
THE BACK OF THE CAR. I CALLED 911 AND
FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN
HOUR AFTER SMASHING THE REAR WINDOW TO GET
ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN
AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE
RESTARTED. SMOLDERING WAS SO HOT IT PARTLY
BURNED THE BACKSEAT. ONCE THE CAR WAS COOL
ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT
WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO
SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS
PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE
SMOKE WAS SMALL AND STARTED ON THE AREA
WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED;
MINUTES LATER THE SAME HEAVY SMOKE CAME OUT
FAST FROM UNDERNEATH THE FRONT PASSENGER
SIDE. THE POLICE WERE THERE TO WITNESS THAT
INCIDENT. IT WAS AROUND MIDNIGHT THEN.
3 SPONTANEOUS COMBUSTIONS IN 4 HOURS; DOOR
CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN

---

[31] *See id.*

OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL;
ONSTAR REPORTS DON'T SHOW ANYTHING
ELECTRICALLY WRONG WITH THE CAR; NO
ALTERATIONS HAD BEEN MADE TO IT; AND THE
DASHBOARD DIDN'T SHOW ANY WARNINGS DURING
THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE
THE PROBLEM WAS A HIGH VOLTAGE BATTERY
RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S
WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE
WE CALLED OUR INSURANCE FIRST INSTEAD OF GM
(PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE
CAR IS CURRENTLY AT AIIA AND GM COULD GO
INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER
BOLTS ARE SPONTANEOUSLY COMBUSTING AND
PEOPLE GETTING HURT? HOW MANY WILL IT TAKE FOR
GM TO CARE? THIS CAR'S DAMAGE LOOKS SIMILAR TO
MINE[32]

- July 8, 2019 NHTSA ID NUMBER: 11230072

Incident Date March 17, 2019

ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE
PARKED THE BOLT IN THE DRIVEWAY OF OUR HOME.
WE EXITED THE BOLT AND PLUGGED IT INTO OUR
JUICEBOX (LEVEL 2) CHARGER AS USUAL. AT
APPROXIMATELY 5:00 PM, WE WERE ALERTED THAT
THE BOLT WAS ON FIRE. WE DISCOVERED SMOKE
BILLOWING OUT OF THE REAR OF THE BOLT AND THE
BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE
AREA OF THE BATTERY CELLS. THE FIRE DEPARTMENT
WAS CONTACTED AND TOOK APPROXIMATELY 3
HOURS TO CONTROL THE FIRE AND SMOKE. THE FIRE
DEPARTMENT EVACUATED US, OUR DOWNSTAIRS
NEIGHBORS, AND BOTH UNITS OF THE HOME NEXT
DOOR DURING THE FIRE. THE FUMES FROM THE
BURNING MATERIALS WAS SO THICK AND NOXIOUS IT
PERMEATED OUR HOME, REQUIRING PROFESSIONAL

---

[32] *See* https://www.nhtsa.gov/vehicle/2019/CHEVROLET/BOLT%2520EV/5%2520HB/FWD
(last visited Nov. 30, 2020).

CLEANING. WE EXPERIENCED HEADACHES FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE BOX. CHEVY PURCHASED THE CAR FROM THE INSURANCE COMPANY.[33]

- November 25, 2020 NHTSA ID NUMBER 11376229

TODAY I RECEIVED RECALL NOTIFICATION GM N202311730 ABOUT DEFECTIVE BATTERIES THAT CAN CAUSE A FIRE WHEN CHARGED TO 100%. GM'S SOLUTION IS TO CHANGE SOFTWARE TO LIMIT MY VEHICLE'S CHARGE TO 90%. THIS IS NOT A SOLUTION. IT IS A BAND AID. THE BATTERIES ARE DEFECTIVE AND SHOULD BE REPLACED. WHY SHOULD I SUFFER THE CONSEQUENCE OF THIS AND HAVE TO DEAL WITH REDUCED VEHICLE RANGE AND MORE FREQUENT CHARGING. IF THE BATTERIES ARE A FIRE HAZARD, THEY SHOULD BE REPLACED WITH SAFE BATTERIES AT NO-COST TO THE OWNER.[34]

- November 24, 2020 NHTSA ID Number 11376136

GM RECALL DUE TO BATTERY FIRES AFFECTS THIS CAR. THE RECALL SOLUTION TO SIMPLY LIMIT MY DRIVING TO 90% OF THE RANGE IS ABHORRENT. MY CAR IS NOW LESS THAN 90% EFFECTIVE--THERE ARE DESTINATIONS I CAN NO LONGER REACH IN A SINGLE CHARGE, AND RECHARGING IS NOWHERE NEAR AS FAST OR UBIQUITOUS AS GAS. GM NEEDS A SOLUTION THAT RESTORES THE FULL DISTANCE ABILITY OF THIS CAR, OTHERWISE IT'S OUTRIGHT FRAUD.[35]

    b.    Twitter
- From @MegMcCutch on 11/2020[36]

---

[33] https://www.nhtsa.gov/vehicle/2018/CHEVROLET/BOLT/5%2520HB/FWD (last visited Jan. 19, 2021).

[34] https://www.nhtsa.gov/vehicle/2017/CHEVROLET/BOLT (last visited Jan. 19, 2021).

[35] https://www.nhtsa.gov/vehicle/2017/CHEVROLET/BOLT (last visited Jan 19, 2021).

[36] https://twitter.com/MegMcCutch/status/1329974156713201667

1. So the recall for the Chevy Bolt was because the main battery is a fire hazard. Their fix? To permanently reduce the battery max charge by 10%. Class action lawsuit anyone? Not worth $40k.

c. <u>Detroit Free Press</u>

- From craig_c. 2 months ago:[37]

   1. If the technology is truly there wouldn't they replace the battery and rework the charging hardware so you can charge to 100 percent? There "FIX" means you just lost 10 percent of your range

d. <u>Reddit</u>
- From IAMA_HOMO_AMA in November 2020:[38]



- From Aliens_Unite in November 2020:[39]



---

[37] *See* https://cm.freep.com/comment/?storyUrl=https%3A%2F%2Fwww.freep.com%2Fstory%2Fmoney%2Fcars%2Fgeneral-motors%2F2020%2F11%2F13%2Fgm-recalls-chevy-bolts-fire-risk%2F6280041002%2F&marketName=freep&commentsopen=false (last visited Jan. 18, 2021).
[38] *See* https://www.reddit.com/r/BoltEV/comments/jtl07l/bolt_recall/ (last visited Jan. 10, 2021).
[39] *See* https://www.reddit.com/r/technology/comments/jtscgg/gm_recalls_68000_electric_chevy_bolts_over/ (last visited Jan. 22, 2020).

**F.** **GM Sold and Continues to Sell Class Vehicles with Knowledge of the Battery Defect**

140.    As set forth above, GM marketed, distributed, and sold Chevrolet Bolt vehicles in multiple states across the nation, including in the State of Illinois.

141.    GM knew or should have known that the Class Vehicles were being advertised and sold with false and misleading representations regarding the range of the Class Vehicles and the risk of fire posed by the defective batteries. However, despite this knowledge, GM has failed to compensate owners and lessees who purchased Class Vehicles. Instead, GM has implemented a temporary software update which comes at a significant cost to functionality, reducing the battery capacity and resulting mileage capabilities by 10%.

142.    Due to these defects, the Chevrolet Bolt is  defective and is not fit for its intended purpose.

143.    As  a  result of GM's unfair, deceptive and/or fraudulent business practices,  Class Members  have been deprived of the benefit of their bargain, have lost use of their Class Vehicles for extended periods of time, have been exposed to dangerous conditions, and have incurred lost time and out-of-pocket costs. Class Vehicles also have suffered a diminution in value due to the Battery Defect.

## CLASS ALLEGATIONS

144.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following Class and Subclasses:

**Nationwide Class**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased for end use and not for resale.**

**Arizona Subclass**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of Arizona for end use and not for resale.**

**Arkansas Subclass**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of Arkansas for end use and not for resale.**

**California Subclass**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of California for end use and not for resale.**

**Illinois Subclass**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of Illinois for end use and not for resale.**

**New York Subclass**
**All purchasers and lessees of model year 2017-2019 Chevrolet Bolt vehicles who purchased or leased their vehicle in the State of New York for end use and not for resale.**

145.     Together, the Nationwide Class and the Arizona, Arkansas, California, Illinois, and New York Subclasses shall be collectively referred to herein as the "Class."

146.     Excluded from the Class are: Defendant, its affiliates, subsidiaries, parents, successors, predecessors, any entity in which Defendant or its parents have a controlling interest; Defendant's current and former employees, officers and directors; the Judge(s) and/or Magistrate(s) assigned to this case; any person who properly obtains exclusion from the Class; any person whose claims have been finally adjudicated on the merits or otherwise released; and the parties' counsel in this litigation. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

147.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual Class Members are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that tens of thousands of Class Members have been subjected to the conduct by Defendant alleged herein. (Upon information and

belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, *etc.*) that GM maintains regarding its sales and leases of Class Vehicles.) As stated above, reports indicate that between 2017 and 2019, more than 57,000 Chevy Bolt vehicles have been sold nationwide.[40]

148. **Existence/Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

      a.      Whether GM engaged in the conduct alleged herein;

      b.      Whether GM knew about (or should have known about) the Battery Defect but failed to disclose it and its consequences to customers or potential customers of Class Vehicles;

      c.      When GM became aware of the Battery Defect;

      d.      Whether GM knowingly concealed the Battery Defect;

      e.      Whether a reasonable consumer would consider the Battery Defect or its consequences to be material;

      f.      Whether GM's conduct alleged herein violates consumer protection statutes, false advertising laws, warranty laws, and other laws as asserted herein;

      g.      Whether Plaintiffs and Class Members overpaid for their Class Vehicles in light of the Battery Defect;

---

[40] https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last visited Nov. 22, 2020).

h.      Whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of GM's conduct alleged herein, and if so, the amount or proper measure of those damages; and

i.      Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

149.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all Class Members were injured in the same manner by Defendant's uniform course of conduct described herein. Plaintiffs and all Class Members have the same claims against Defendant relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class Members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct in selling and failing to remedy defective Class Vehicles. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members. There are no defenses available to GM that are unique to Plaintiffs.

150.    **Adequacy:** Plaintiffs are adequate representatives for the Class (and for each applicable Subclass) because their interests do not conflict with the interests of the Class (and Subclass) that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including consumer fraud and automobile defect class action cases – and counsel intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

151.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and all Class Members. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of

individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class to effectively individually redress the wrongs done to them by GM. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## ANY APPLICABLE STATUTE OF LIMITATIONS ARE TOLLED

152.     Plaintiffs and Class Members did not discover, and could not have discovered through reasonable diligence, that the Class Vehicles had the Battery Defect or any defect that would cause a battery fire risk or any other risk that would cause their vehicle to lose 10% of its range or more. The only means for Plaintiffs and Class Members to make this discovery was either via notice by Defendant or via their own Bolt bursting into flames.

153.     Accordingly, the tolling doctrine applies and any otherwise-applicable statute of limitation have been tolled under the discovery rule. Additionally, all applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment.

154.     Further, GM is estopped from relying on any statutes of limitations in defending this action because despite GM's continuous duty to disclose to Plaintiffs and Class Members the character, quality, and nature of the Class Vehicles' battery and range, GM knowingly concealed the Battery Defect from Bolt owners and lessees.

## COUNT I
### Breach of Implied Warranty of Merchantability
### Violation of ARIZ. REV. STAT. ANN. § 47-2314
### (Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)

155.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

156.    Plaintiffs Field and Poletti bring this claim individually and on behalf of the Arizona Subclass.

157.    Defendant is a "seller" and "merchant" with respect to the Class Vehicles. ARIZ. REV. STAT. ANN. § 47-2314(A).

158.    When Defendant sold its Class Vehicles to Plaintiffs Field and Poletti and sold or leased Class Vehicles to members of the Arizona Subclass, Defendant warranted that the Class Vehicles were merchantable – *i.e.*, that they would "[p]ass without objection in the trade . . ." and were "fit for the ordinary purposes for which such goods are used[.]" ARIZ. REV. STAT. ANN. § 47-2314(B)

159.    The Class Vehicles have a Battery Defect which puts them at risk of spontaneous combustion when charged to full or almost-full battery levels, which Defendant had represented to Plaintiffs and Class Members was a charging practice that was appropriate and safe. The Class Vehicles are thus not fit for their ordinary purpose of transporting vehicle occupants in a reasonably safe manner during normal operation.

160.    The Battery Defect existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time the Class Vehicles were sold to Plaintiffs Field and Poletti and sold or leased to members of the Arizona Subclass.

161.    Defendant breached the implied warranty that the Class Vehicles were appropriate and safe for ordinary use by marketing, distributing, selling, and leasing Class Vehicles that contained the Battery Defect.

162.    As a direct and proximate result of this breach of implied warranty, Plaintiffs Field and Poletti and the members of the Arizona Subclass have suffered various injuries, including but not limited to having overpaid for their Class vehicles and diminution in value of their Class Vehicles.

<div align="center">

**COUNT II**
**Breach of Express Warranty**
**Violation of ARIZ. REV. STAT § 47-2313**
**(Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)**

</div>

163.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

164.    Plaintiffs Field and Poletti bring this claim individually and on behalf of the Arizona Subclass.

165.    Plaintiffs Field and Poletti and members of the Arizona Subclass are "buyers" with respect to the Class Vehicles. ARIZ. REV. STAT. ANN. § 47-2313.

166.    Defendant is a "seller" with respect to the Class Vehicles. ARIZ. REV. STAT. ANN. § 47-2313.

167.    Defendant expressly warranted through statements and advertisements that the Class Vehicles were of high quality, would operate properly and safely, and could be safely and fully charged for a driving range of 238 miles. ARIZ. REV. STAT. ANN. § 47-2313(A).

168.    Defendant breached this warranty by selling or leasing Class Vehicles equipped with the Battery Defect that could not be safely fully charged and, as a result, could not meet the Bolt's advertised range of 238 miles.

169.    The Battery Defect existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time the Class Vehicles were sold to Plaintiffs Field and Poletti and sold or leased to members of the Arizona Subclass.

170.    As a direct and proximate result of this breach of express warranty, Plaintiffs Field and Poletti and the members of the Arizona Subclass have suffered various injuries, including having overpaid for their Class vehicles and diminution in value of their Class Vehicles.

### COUNT III
**Violation of the Arizona Consumer Fraud Act**
**ARIZ. REV. STAT. ANN. § 44-1522**
**(Plaintiffs Field and Poletti on Behalf of the Arizona Subclass)**

171.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

172.    Plaintiffs Field and Poletti bring this claim individually and on behalf of the Arizona Subclass.

173.    Plaintiffs Field and Poletti and Defendant are "persons" within the meaning of Section 44-1522 of the Arizona Consumer Fraud Act. ARIZ. REV. STAT. ANN. § 44-1522.

174.    Arizona prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." ARIZ. REV. STAT. ANN. § 44-1522(A).

175.    As alleged herein, Defendant advertised that Class Vehicles' batteries could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

176.    Defendant intended that consumers would rely on these material misrepresentations, inducing Plaintiffs Field and Poletti and members of the Arizona Subclass, when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

177.    Plaintiffs Field and Poletti and members of the Arizona Subclass reasonably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**Violation of the Arkansas Deceptive Trade Practices Act**
**ARK. CODE ANN. § 4-88-101, *et seq.***
**(Plaintiff Allen on Behalf of the Arkansas Subclass)**

178.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

179.    Plaintiff Allen brings this claim individually and on behalf of the Arkansas Subclass.

180.    Plaintiff Allen and Defendant are "[p]erson[s]" within the meaning of the Arkansas Deceptive Trade Practices Act ("DTPA"). ARK. CODE ANN. § 4-88-102(5).

181.    The Class Vehicles are "[g]oods" under the DTPA. ARK. CODE ANN. § 4-88-102(4).

182.    The DTPA prohibits "[k]nowingly making a false representation as to…whether goods are…of a particular standard, quality, grade, style or model;…[and/or] [e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. §§ 4-88-107(a)(1), (10).

183.    The DTPA also prohibits "[a]dvertising…goods…with the intent not to sell them as advertised[.]" ARK. CODE ANN. § 4-88-107(a)(3).

184.     In connection with the "sale or advertisement of any goods," it is unlawful under the DTPA to "act, use, or employ[]…any deception, fraud, or false pretense" and/or to "conceal[], suppress[], or omi[t]…any material fact with intent that others reply upon the concealment, suppression, or omission…[.]" ARK. CODE ANN. §§ 4-88-108(a)(1)-(2).

185.     Defendant's conduct is in violation of the DTPA constituting deceptive and unconscionable trade practice because Defendant knowingly and intentionally made representations to Plaintiff Allen and members of the Arkansas Subclass that amounted to deception, fraud, false pretenses, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of the material fact that Class Vehicles contain a latent Battery Defect that causes the loss of efficiency, safety risks, and diminished value.

186.     In the course of Defendant's business, it misrepresented, failed to disclose, and actively concealed the Battery Defect in the Class Vehicles with the intent that consumers rely on that concealment in deciding whether to purchase or lease a Class Vehicle.

187.     By intentionally concealing the Battery Defect while advertising the Class Vehicles as capable, reliable and safe, Defendant engaged in deceptive acts or practices in violation of the DTPA.

188.     Defendant's deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiff Allen, about the true performance and value of the Class Vehicles.

189.     Plaintiff Allen and members of the Arkansas Subclass were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant suppressed.

190.     Defendant's actions were unconscionable because they affront the sense of justice, decency, and reasonableness, including as established by public policy and the state and federal laws enumerated herein.

191.     Defendant's actions set forth above occurred in the conduct of its business, trade, or commerce.

192.     Defendant's unlawful and misleading conduct concerns widely purchased consumer goods and affects the public interest. Defendant's conduct includes unlawful and misleading acts or practices that have and had the capacity to deceive consumers and are harmful to the public at large.

193.     Plaintiff Allen and members of the Arkansas Subclass suffered ascertainable loss as a direct and proximate result of Defendant's DTPA violations. Plaintiff Allen and members of the Arkansas Subclass overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's material unlawful and misleading conduct.

194.     As a result of Defendant's DTPA violations, Plaintiff Allen and members of the Arkansas Subclass are entitled to recover actual damages, as well as reasonable attorneys' fees.

### COUNT V
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq*. ("MMWA")**
**(Nationwide Class)**

195.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

196.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

197.     The Class Vehicles are a "consumer product" under the MMWA, 15 U.S.C. § 2301(1).

198.    Plaintiffs and Class Members are "consumers" under the MMWA, 15 U.S.C. § 2301(3).

199.    Defendant is a "supplier" and "warrantor" under the MMWA, 15 U.S.C. §§ 2301(4)-(5).

200.    Under 15 U.S.C. § 2301(d)(1), consumers have a cause of action when they are damaged when a warrantor does not comply with a written warranty.

201.    Defendant's 3-year/36,000 mile "bumper to bumper" new vehicle limited warranty is a "written warranty" under the MMWA.[41] 15 U.S.C. § 2301(6).

202.    Defendant's 5-year/60,000 mile powertrain new vehicle limited warranty is a "written warranty" under the MMWA.[42] 15 U.S.C. § 2301(6).

203.    Defendant's 5-year/60,000 mile optional extended new vehicle limited warranty is a "written warranty" under the MMWA.[43] 15 U.S.C. § 2301(6).

204.    Defendant's 8-year/100,000 mile electric vehicle component warranty is a "written warranty" under the MMWA.[44] 15 U.S.C. § 2301(6).

205.    Defendant's representations that Class Vehicles sold to Plaintiffs and other Class Members have "an EPA-estimated 238 miles" on "a full charge" and "offer[] more than 383 km

---

[41] https://www.chevrolet.com/important-information (last visited Jan. 22, 2021);
https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2017/Chevrolet/BOLT%20EV/Owner's%20Manual.pdf (last visited Jan. 22, 2021);
https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/2018-chevrolet-limited-warranty-and-owner-assistance-information.pdf (last visited Jan. 22, 2021);
https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/19_CHEV_WM_.pdf (last visited Jan. 22, 2021).
[42] *See id.*
[43] *See id.*
[44] *See id.*

of range" and that Plaintiffs and Class Members could "top off your battery as much or as little as you like" are written warranties  within the meaning of the MMWA, 15 U.S.C. § 2301(6).[45]

206.    Through these written warranties, Defendant warranted to Plaintiffs and Class Members that the Class Vehicles they purchased were free from defects, of merchantable quality, and fit for ordinary and represented use.

207.    Plaintiffs and Class Members relied on the existence and length of these written warranties when deciding whether to purchase or lease the Class Vehicles.

208.    Defendant breached its written warranties as described herein. Contrary to Defendant's representation, Plaintiffs and other Class Members were subject to the Battery Defect and were faced with the choice of limiting their battery charge to 90% (or less) or subjecting themselves to the risk of a potential car fire.

209.    Defendant further breached its written warranties by:

    a.    Selling and leasing Class Vehicles with a battery that was defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

    b.    Refusing and/or failing to honor the warranties by repairing or replacing the battery and thereby leaving the Class Vehicles with a capability less than that was advertised.

210.    Defendant knew, or should have known, of the Battery Defect in the Class Vehicles.

---

[45] https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle#charging (last visited Jan. 22, 2021); https://web.archive.org/web/20190421140946/https://www.chevrolet.com/previous-year/bolt-ev-electric-car (last visited Jan. 22, 2021); https://web.archive.org/web/20180929091633/https://www.chevrolet.com/electric/bolt-ev-electric-car?cmp=OLA_DISPLAY_20519044_211515933_411199255_77369262 (last visited Jan. 22, 2021); https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2017.html (last visited Jan. 22, 2021); https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2018.html (last visited Jan. 22, 2021); https://media.chevrolet.com/media/ca/en/chevrolet/vehicles/Bolt-EV/2019.html (last visited Jan. 22, 2021).

211.    Defendant knew, or should have known, of its misrepresentations and omissions regarding the capabilities of the Class Vehicles, yet proceeded with a coordinated advertising campaign through which Defendant promised that the Class Vehicles have "an EPA-estimated 238 miles" on "a full charge" and "offer[s] more than 383 km of range" and that Plaintiff and Class Members can "top off your battery as much or as little as you like."

212.    Defendant has been given reasonable opportunity to cure its breaches of warranty. Defendant had actual knowledge and ample notice that the battery in the Class Vehicles is and was defective, but failed to provide an adequate remedy.

213.    As a result of the Battery Defect, the Class Vehicles fail to perform in accordance with their ordinary and intended purposes and are unfit and unreasonably dangerous for ordinary use.

214.    As a direct and proximate result of Defendant's breach of written warranties, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

215.    The amount in controversy for purposes of Plaintiffs' individual claims exceeds $25. The amount in controversy in this action exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be adjudicated. 15 U.S.C. § 2310(d)(3).

216.    Plaintiffs also seek costs and expenses, including reasonable attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

### COUNT VI
**Violation of the Song-Beverly Consumer Warranty Act**
**CAL. CIV. CODE § 1790, *et seq.***
**(Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass)**

217.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

218. Plaintiffs McQuarrie and Dickinson bring this claim individually, and on behalf of the Nationwide Class and the California Subclass.

219. Plaintiffs McQuarrie and Dickinson are "[b]uyer[s]" within the meaning of CAL. CIV. CODE § 1791(b). Both Plaintiffs McQuarrie and Dickinson purchased their Class Vehicles in California.

220. Defendant is a "[m]anufacturer" within the meaning of CAL. CIV. CODE § 1791(j). Defendant directed and/or was involved in all stages of the production, manufacturing, selling, distributing, and then warrantying, the Class Vehicles.

221. The Class vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

222. Defendant impliedly warranted to Plaintiffs McQuarrie and Dickinson and to members of the California Subclass that the Class Vehicles they purchased were "merchantable" under CAL. CIV. CODE §§ 1791.1(a) and 1792.

223. Defendant breached the implied warranty of merchantability by producing, manufacturing, selling, and leasing Class Vehicles that were not of merchantable quality. The Class Vehicles are defective, resulting in unsafe and unreliable transportation with the potential to prematurely and catastrophically fail. The Class Vehicles, therefore, are unfit for the ordinary and intended purposes – providing safe and reliable transportation while being operated.

224. The Battery Defect in the Class Vehicles existed at the time of sale and lease and throughout the warranty periods. Accordingly, any subsequent discovery of the defect beyond that time does not bar an implied warranty claim under the Song-Berry Act.

225. Any attempt by Defendant to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to CAL. CIV. CODE § 1792.4, which

provides that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Defendant's attempted warranty disclaimer does not conform to §§ 1792.3 and 1792.4.[46]

226.    As a direct and proximate cause of Defendant's breaches of the Song-Beverly Consumer Warranty Act, pursuant to CAL. CIV. CODE §§ 1791.1(d) and 1794, Plaintiffs McQuarrie and Dickinson and members of the California Subclass have been damaged in an amount to be proven at trial.

227.    Plaintiffs McQuarrie and Dickinson seek costs and expenses, including reasonable attorneys' fees, under CAL. CIV. CODE § 1794.

## COUNT VII
### Violation of the California Unfair Competition Law
### CAL. BUS. & PROF. CODE § 17200, *et seq*. ("UCL")
### (Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass)

228.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

229.    Plaintiffs bring this claim individually, and on behalf of the Nationwide Class and on behalf of the California Subclass.

---

[46] https://www.chevrolet.com/important-information (last visited Jan. 22, 2021); https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2017/Chevrolet/BOLT%20EV/Owner's%20Manual.pdf (last visited Jan. 22, 2021); https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/2018-chevrolet-limited-warranty-and-owner-assistance-information.pdf (last visited Jan. 22, 2021); https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/19_CHEV_WM_.pdf (last visited Jan. 22, 2021).

230. The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." CAL. BUS. & PROF. CODE § 17200.

## Unlawful

231. Defendant's conduct is unlawful, in violation of the UCL, because it violates the California Consumer Legal Remedies Act, the Magnuson-Moss Warranty Act, the Song-Beverly Warranty Act, and constitutes a breach of express and implied warranties, and fraudulent concealment.

## Unfair

232. Defendant's conduct is unfair in violation of the UCL because it violates California public policy, legislatively declared in the Song-Beverly Consumer Warranty Act, requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

233. Moreover, Defendant acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner. For example:

a. Defendant promoted and sold Class Vehicles it knew suffered from the Battery Defect thereby triggering safety concerns;

b. Defendant failed to disclose that the Class Vehicles were and are defective, and represented through advertising, press releases, and other sources that the Class Vehicles possessed particular qualities that were inconsistent with Defendant's knowledge of the product;

c. Defendant has not made any repairs or provided replacements, making its express and implied warranties useless;

d.      Defendant failed to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

e.      Defendant minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that their batteries are and were defective and failing to provide adequate relief to consumers.

234.    The gravity of harm resulting from Defendant's unfair conduct outweighs any potential utility. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the defect—and continuing to sell these Class Vehicles without full and fair disclosure of the defect—harms the public at large and is part of a common and uniform course of wrongful conduct.

235.    The harm from Defendant's conduct was not reasonably avoidable by consumers. The Class Vehicles suffer from a Battery Defect, and even after receiving a number of consumer complaints, Defendant did not disclose the defect. Plaintiffs did not know of, and had no reasonable means of discovering, that the Class Vehicles are defective.

236.    There were reasonably available alternatives that would have furthered Defendant's business interests of satisfying and retaining its customers while maintaining profitability, such as: (1) allowing adequate development time to analyze the results of pre-release testing and implementing corrective measures; (2) acknowledging the Battery Defect and providing a permanent fix; (3) disclosing the Battery Defect to prospective purchasers; (4) extending the warranties for the Class Vehicles; and/or (5) offering refunds or suitable non-defective replacement batteries for all Class Vehicles.

**Fraud by Omission**

237.   Defendant's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer:

a.   Defendant knowingly and intentionally concealed from Plaintiffs and Class Members that the Class Vehicles contain a Battery Defect that causes safety risks and diminished value and that requires an interim remedy that reduces vehicle range;

b.   Defendant volunteered information to Plaintiffs and Class Members through advertising and through other means that the Class Vehicles—and specifically, the batteries—were functional, premium devices without disclosing information that would have materially qualified those partial representations; and

c.   Defendant promoted the superior capabilities of the Class Vehicles—including their driving range—despite knowing the Class Vehicles are defective, and failed to correct its misleading partial disclosures.

238.   Defendant had ample means and opportunities to alert Plaintiffs and Class Members to the fact that the Class Vehicles are defective, including on its web platforms advertising and selling the Class Vehicles; on the web platforms of its authorized dealers advertising and selling the Class Vehicles; on the Class Vehicles' external stickers; and in the Class Vehicles' manuals and written warranties. But Defendant uniformly failed to disclose that the Class Vehicles were defective.

239.   Defendant was under a duty to disclose the Battery Defect because of its exclusive knowledge of the defect before selling Class Vehicles and because it made partial representations about the Class Vehicles and their battery without also disclosing the latent defect.

240.     Plaintiffs and Class Members suffered injury in fact, including lost money or property, as a result of Defendant's unlawful, unfair, and fraudulent acts and omissions. Absent Defendant's unlawful, unfair, and fraudulent conduct, Plaintiffs and Class Members would not have purchased their Class Vehicles, or would not have purchased them at the prices they did.

241.     Through its unlawful, unfair, and fraudulent conduct, Defendant acquired Plaintiffs' and Class Members' money, directly and as passed on by Defendant's authorized dealers.

242.     Plaintiffs and Class Members accordingly seek appropriate relief, including restitution under the UCL. Plaintiffs also respectfully seek reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure section 1021.5.

<u>**COUNT VIII**</u>
**Violation of California's Consumer Legal Remedies Act**
**CAL. CIV. CODE § 1750, *et seq*. ("CLRA")**
**(Plaintiffs McQuarrie and Dickinson on Behalf of the California Subclass)**

243.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

244.     Plaintiffs McQuarrie and Dickinson bring this claim individually, and on behalf of the Nationwide Class and the California Subclass.

245.     Defendant is a "person" within the meaning of CAL. CIV. CODE §§ 1761(c) and 1770, and provided "goods" within the meaning of CAL. CIV. CODE §§ 1761(a) and 1770.

246.     Defendant's acts and practices, as alleged in this complaint, violate the CLRA, CAL. CIV. CODE §§ 1770(a)(5), (7), and (9) because they consist of unfair and deceptive acts and practices in connection with transactions—namely, the sale of defective Class Vehicles to Plaintiffs and Class members. Specifically, Defendant:

a.     Represented that the Class Vehicles had capabilities, uses, and benefits they do not have;

b.     Represented that the Class Vehicles were of a standard or quality that they are not; and

c.     Intentionally sold or leased the Class Vehicles not as advertised.

247.    Defendant was aware that the Class Vehicles' batteries were defective and unsafe.

248.    Defendant was under a duty to disclose that the Class Vehicles suffered from the Battery Defect because it had superior knowledge of the defect and because it made many general, partial representations regarding the Class Vehicles' capabilities, including the driving range of the batteries, that were materially misleading.

249.    Defendant had opportunities to disclose to Plaintiffs and Class Members that the Class Vehicles were defective, including through advertisements, on external stickers, and in written manuals and warranties. Despite its exclusive knowledge and opportunities to disclose the Class Vehicles' defective nature, Defendant failed to disclose the Battery Defect to Plaintiffs and Class Members prior to purchase or lease.

250.    Defendant's misrepresentations and omissions were material. Had Plaintiffs and Class Members known that the Class Vehicles are defective, they would not have purchased their Class Vehicles, or would not have purchased them at the prices they did.

251.    Pursuant to CAL. CIV. CODE § 1780, Plaintiffs seek actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

252.    Pursuant to CAL. CIV. CODE § 1782(a), on their own behalf and on behalf of the Class, Plaintiffs McQuarrie and Dickinson each sent CLRA notices to GM on December 16, 2020.

Plaintiffs' CLRA notices were sent via certified mail, return receipt requested, to Defendant's principal place of business, advising Defendant that it is in violation of the CLRA and must correct, replace or otherwise rectify the goods alleged to be in violation of CAL. CIV. CODE § 1770. GM failed to correct its business practices or provide the requested relief within 30 days.  Accordingly, Plaintiffs now seek monetary damages under the CLRA.

253.    Plaintiffs' CLRA venue declarations are attached as **Exhibits 1 and 2** to this complaint in accordance with CAL. CIV. CODE § 1780(d).

### COUNT IX
### Breach of Express Warranty
### (Nationwide Class or, alternatively, State Subclasses)

254.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

255.    Plaintiffs bring this claim individually, and on behalf of the Class.

256.    Plaintiffs and other Class Members formed a contract with Defendant at the time they purchased or leased their Class Vehicles. The terms of the contract include the promised and affirmation of fact and express warranties made by Defendant.

257.    "In addition to the express conditions and warranties" Defendant provides the following warranties for its Class Vehicles:

a.    A Bumper-to-Bumper Limited Warranty of 3 years/36,000 miles where "Chevrolet is committed to ensuring satisfaction with your new vehicle. Your Chevrolet dealer also wants you to be completely satisfies and invites you to return for all your service needs, both during and after the warranty period";

b.    A Powertrain Limited Warranty of 5 year/60,000 miles;

    c. An Electric and Hybrid Warranty that "warrant[s] certain components for each Chevrolet…Bolt EV…for 8 years or 100,000 miles…against warrantable repairs to the specific electric propulsion components of the vehicle" which includes repair and replacement to the "Electric Propulsion Battery."[47]

258. Plaintiffs and Class Members' Class vehicles did not perform as promised due to the Battery Defect.

259. Defendant has actual knowledge that it breached the express warranties with Plaintiffs and Class Members related to the Class Vehicles.

260. Defendant breached the terms of the express warranties with Plaintiffs and Class Members by not providing the Class Vehicles with properly functioning batteries.

261. Plaintiffs sought assistance for their Class Vehicle from Defendant pursuant to the recall during the express warranty period. However, no permanent fix is currently available and Class Vehicles have not been repaired and restored to the condition warranted.

262. As the foreseeable and actual result of Defendant's breach of express warranties, Plaintiffs and Class Members were damaged in an amount that is the difference between the value of the Class Vehicles if they had possessed batteries as warranted and performed as represented and the value of the Class Vehicles that they actually received.

---

[47] https://www.chevrolet.com/important-information (last visited Jan. 22, 2021); https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2017/Chevrolet/BOLT%20EV/Owner's%20Manual.pdf (last visited Jan. 22, 2021); https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/2018-chevrolet-limited-warranty-and-owner-assistance-information.pdf (last visited Jan. 22, 2021); https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/19_CHEV_WM_.pdf (last visited Jan. 22, 2021).

## COUNT X
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. 505/1, *et seq.*
### (Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)

263.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

264.    Plaintiffs Torres and Whittaker bring this claim individually and on behalf of the members of the Illinois Subclass.

265.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce. An act is deemed "unfair" if it violates Illinois public policy and amounts to immoral, unethical, or unscrupulous conduct.

266.    Defendant is a "person" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(c).

267.    Plaintiffs are both "consumer[s]" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(e).

268.    Defendant's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving and did deceive a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

269.    Defendant knew that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

270.    Defendant had the duty to Plaintiffs and Class Members to disclose the Battery Defect and the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the Battery Defect and its associated costs;

b.      Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

c.      Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the Battery Defect and the effect it would have, including the interim remedy that would cut back Class Vehicles' range.

271.    In failing to disclose the Battery Defect and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

272.    The facts Defendant concealed or did not disclose to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price for them. Had Plaintiffs and the Class known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

273.    Defendant's conduct caused Plaintiffs' damages as alleged.

274.    Defendant's conduct is and was also unfair, oppressive, and unethical and is actionable under this Act because such conduct occurred within the course of trade or commerce. Defendant's conduct caused substantial harm to consumers and generally implicates consumer protection concerns.

275.    Defendant's conduct also violates Illinois public policy, which prohibits manufacturers from misrepresenting the quality and nature of their products in the marketplace or failing to disclose facts which may be material to prospective purchasers and lessors.

276.    As a result of Defendant's wrongful conduct, Plaintiffs Torres and Whittaker and members of the Illinois Subclass have been damaged in an amount to be proven at trial, including,

but not limited to, actual damages, court costs, and reasonable attorneys' fees pursuant to 815 Ill.

Comp. Stat. 505/10, *et seq.*

## COUNT XI
**Violation of Illinois Uniform Deceptive Trade Practices Act**
**815 Ill. Comp. Stat. 510/1, *et seq.***
**(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)**

277.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

278.     Plaintiffs Torres and Whittaker bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

279.     The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a), provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person" does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . (9) advertises goods or services with intent not to sell them as advertised; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

280.     Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

281.     The Class Vehicles sold to Plaintiffs Torres and Whittaker and the Illinois Subclass were not of the particular sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities represented by Defendant.

282.    The Class Vehicles sold to Plaintiffs Torres and Whittaker and the Illinois Subclass were not of the particular standard, quality, and/or grade represented by Defendant.

283.    Defendant caused to be made or disseminated through Illinois and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Defendant should have known to be untrue and misleading to consumers, including Plaintiffs and other Class members.

284.    Defendant has violated 815 Ill. Comp. Stat. 510/2 because its misrepresentations and omissions regarding the safety, reliability, functionality, and energy efficiencies of the Class Vehicles were material and likely to confuse or deceive a reasonable consumer.

285.    Plaintiffs Torres and Whittaker and members of the Illinois Subclass have suffered injuries in fact, including the loss of money or property, resulting from Defendant's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs Torres and Whittaker and members of the Illinois Subclass relied on Defendant's misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendant's representations were untrue because of the Battery Defect. Had Plaintiffs Torres and Whittaker and the other members of the Illinois Subclass known of the Battery Defect, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, Plaintiffs Torres and Whittaker and the other members of the Illinois Subclass did not receive the benefit of their bargain.

286.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Illinois and nationwide.

287.   Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or was reckless and/or was in conscious disregard for the rights of Plaintiffs Torres and Whittaker and the Illinois Subclass.

288.   As a result of the foregoing wrongful conduct of Defendant, Plaintiffs Torres and Whittaker and the Illinois Subclass have been damaged in an amount to proven at trial, including, but not limited to actual and punitive damages, equitable relief and reasonable attorneys' fees.

<div style="text-align:center">

**COUNT XII**
**Breach of Implied Warranty of Merchantability**
**810 Ill. Comp. Stat. 5/2-314 and 810 Ill. Comp. Stat. 5/2A-212**
**(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)**

</div>

289.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

290.   Plaintiffs Torres and Whittaker bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

291.   Defendant impliedly warranted that its vehicles were of good and merchantable quality and fit and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

292.   Defendant breached the implied warranty that the Class Vehicles were merchantable and safe for use as public transportation by marketing, advertising, distributing, selling, and leasing Class Vehicles with the common Battery Defect.

293.   This defect existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time they were sold or leased to Plaintiffs and Class Members.

294.   This defect, including GM's interim remedy to address such defect, was the direct and proximate cause of damages to Plaintiffs Torres and Whittaker and the Illinois Subclass.

**COUNT XIII**
**Breach of Express Warranty**
**810 Ill. Comp. Stat. 5/2-313**
**(Plaintiffs Torres and Whittaker on Behalf of the Illinois Subclass)**

295.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

296.    Plaintiffs Torres and Whittaker bring this claim on behalf of themselves and on behalf of the Illinois Subclass.

297.    Defendant expressly warranted – through statements and advertisements – that the Class Vehicles were of high quality, and at a minimum, would work properly and safely.

298.    Defendant breached this warranty by knowingly selling and leasing vehicles with dangerous defects.

299.    Plaintiffs Torres and Whittaker and the Illinois Subclass have been damaged as a direct and proximate result of Defendant's breaches in that the Class Vehicles purchased or leased by Plaintiffs Torres and Whittaker and the Illinois Subclass were, and are, worth far less than what they paid to purchase or lease, which was reasonably foreseeable to Defendant.

300.    The Class Vehicles were defective as herein alleged at the time they left Defendant's factories, and the vehicles reached Plaintiffs and Class Members without substantial change in the condition in which they were sold or leased.

301.    As a direct and proximate result of Defendant's breaches, Plaintiffs Torres and Whittaker and the Illinois Subclass have suffered damages, including, but not limited to, diminution in value, return of lease payments and penalties, and injunctive relief related to future lease payments or penalties.

<div align="center">

**COUNT XIV**
**Violations of New York General Business Law § 349**
**N.Y. GEN. BUS. LAW § 349**
**(Plaintiff Kotchmar on Behalf of the New York Subclass)**

</div>

302.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

303.    Plaintiff Kotchmar brings this claim on behalf of himself and on behalf of the New York Subclass.

304.    Plaintiff Kotchmar and members of the New York Subclass are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. GEN. BUS. LAW § 349(h).

305.    Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful. N.Y. GEN. BUS. LAW § 349.

306.    In the course of Defendant's business, it willfully failed to disclose and actively concealed the Battery Defect in the Class Vehicles with the intent that consumers rely on that concealment in deciding whether to purchase a Class Vehicle.

307.    By concealing the Battery Defect while advertising the Class Vehicles as capable, reliable and safe, Defendant engaged in deceptive acts or practices in violation of GBL section 349.

308.    Defendant's deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiff Kotchmar and members of the New York Subclass, about the true performance and value of the Class Vehicles.

309.    Plaintiff Kotchmar and members of the New York Subclass were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant suppressed.

310.    Defendant's misleading conduct concerns the safety of widely purchased consumer products and affects the public interest.

311.    Defendant's actions set forth above occurred in the conduct of its business, trade, or commerce.

312.    Plaintiff Kotchmar and member of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations. Plaintiff Kotchmar and members of the New York Subclass overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

313.    Plaintiff Kotchmar and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair and deceptive practices. Under the GBL, Plaintiff Kotchmar and members of the New York Subclass are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendant acted willfully or knowingly, Plaintiff Kotchmar and members of the New York Subclass are entitled to recover three times their actual damages. Plaintiff Kotchmar is also entitled to reasonable attorneys' fees. N.Y. GEN. BUS. LAW § 349(h).

### COUNT XV
**Violations of New York General Business Law § 350**
**N.Y. GEN. BUS. LAW § 350**
**(Plaintiff Kotchmar on Behalf of the New York Subclass)**

314.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

315.    Plaintiff Kotchmar brings this claim on behalf of himself and on behalf of the New York Subclass.

316.    GBL section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce…." N.Y. GEN. BUS. LAW § 350.   False advertising includes "advertising, including labeling, of a commodity…if such advertising is misleading in a material

respect," taking into account "not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity…to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." N.Y. GEN. BUS. LAW § 350-a.

317.    Defendant caused or made to be disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff Kotchmar and other members of the New York Subclass.

318.    Defendant has violated GBL section 350 because the misrepresentations and omissions regarding the dangerous Battery Defect were material and were likely to and did deceive reasonable consumers, including Plaintiff Kotchmar and members of the New York Subclass, about the true performance and value of the Class Vehicles.

319.    Plaintiff Kotchmar and members of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendant's GBL false advertising violations. In purchasing or leasing their Class Vehicles, Plaintiff Kotchmar and members of the New York Subclass relied on Defendant's representations and omissions with respect to safety, performance, reliability, and value of the Class Vehicles. Defendant's representations turned out to be untrue because the Class Vehicles are subject to the Battery Defect. Had Plaintiff Kotchmar or members of the New York Subclass know this, they would not have purchased or leased their Class Vehicles or would have paid less money for them.

320.     Plaintiff Kotchmar and members of the New York Subclass overpaid for their Class Vehicles and their Class Vehicles suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

321.     Plaintiff Kotchmar and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and deceptive practices of false advertising. Under the GBL, Plaintiff Kotchmar and members of the New York Subclass are entitled to recover their actual damages or $500, whichever is greater. Additionally, because Defendant acted willfully or knowingly, Plaintiff Kotchmar and members of the New York Subclass are entitled to recover three times their actual damages, up to $10,000. Plaintiff Kotchmar is also entitled to reasonable attorneys' fees. N.Y. GEN. BUS. LAW § 350-e.

<div align="center">

**COUNT XVI**
**Common Law Fraud**
**(Nationwide Class or, alternatively, State Subclasses)**

</div>

322.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

323.     Defendant made material omissions concerning a presently existing or past fact. For example, Defendant did not fully and truthfully disclose to its customers the true nature of the inherent Battery Defect. A reasonable consumer would have expected that the Chevy Bolt would not be defective and pose a serious safety risk. The facts concealed or not disclosed by Defendant to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their Battery Defect, they would not have purchased or leased the Class Vehicles or would

have paid less for them. As a result, Plaintiffs and the other Class members were fraudulently induced to purchase or lease the Class Vehicles with the said defects and all of the resultant problems.

324.    Plaintiffs and Class Members reasonably relied on these omissions and suffered damages as a result. To the extent that Defendant's conduct was willful, oppressive or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

## COUNT XVII
### Fraudulent Concealment / Fraud by Omission
### (Nationwide Class or, alternatively, State Subclasses)

325.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

326.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Class.

327.    Defendant intentionally concealed the Battery Defect, acted with reckless disregard for the truth, and denied Plaintiffs and the Class highly relevant information to their purchasing decisions.

328.    Defendant further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged. Defendant knew that these representations were false when made.

329.    The Class Vehicles purchased or leased by Plaintiffs and the Class were, in fact, defective, unsafe, and unreliable, because the vehicles' batteries were susceptible to bursting into flame when fully charged or nearly fully charged.

330.    Defendant had a duty to disclose that these vehicles were defective, unsafe, and unreliable because Plaintiffs relied on Defendant's material representations that the Class Vehicle's battery could be safely fully charged to permit the vehicles to travel for a reported range of 238 miles on a single full charge.

331.    The aforementioned concealment was material because if it had been disclosed, Plaintiffs would not have bought or leased the Class Vehicles or would have bought or leased the vehicle at a substantially reduced price.

332.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a motor vehicle. Defendant knew or recklessly disregarded that its representations were false, but intentionally made the false statements to sell or lease the Class Vehicles.

333.    Plaintiffs relied on Defendant's reputation along with Defendant's failure to disclose and Defendant's affirmative assurance that its vehicles would safely and reliably travel the disclosed driving range when purchasing the Class Vehicles.

334.    Plaintiffs and the Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of the Class Vehicles.

335.    Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the Class. Plaintiffs and the Class are therefore entitled to an award of punitive damages.

## COUNT XVIII
### Unjust Enrichment
### (Nationwide Class or, alternatively, State Subclasses)

336.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs.

337.    Plaintiffs and Class Members have overpaid for their defective Class Vehicles in amounts that they would not have paid to purchase or lease the vehicles had they known of the Battery Defect.

338.    Defendant has been unjustly enriched by these overpayments which were obtained by the conduct described herein. Equity militates against Defendant retaining these ill-gotten gains.

339.    Defendant should be required to relinquish the monies it obtained and disgorge its profits from sales of the Class Vehicles as restitution in order to place Plaintiffs and Class Members in the position in which they would have been had Defendant not knowingly sold Class Vehicles with a concealed Battery Defect that potentially causes a vehicle fire and which has led Plaintiffs and Class Members to experience reduced driving range.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, hereby request that this Court enter an Order against Defendant providing the following:

A.  Certification of the proposed Class, appointment of Plaintiffs as representative of the respective Subclasses, and counsel of record as Class Counsel;

B.  Injunctive relief temporarily and permanently enjoining Defendant from continuing to engage in the unlawful conduct alleged herein;

C.  Payment to Plaintiffs and Class Members of all out-of-pocket expenses resulting from or arising from the Battery Defect alleged herein;

69

D. An award of all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class Members are entitled (including, without limitation, any payments made to Chevrolet dealers to address the Battery Defect);

E. An award of pre- and post-judgment interest on any amounts awarded;

F. Any additional appropriate equitable, injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Vehicles and to extend applicable warranties to a reasonable period of time, and to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Battery Defect;

G. An award of reasonable attorneys' fees, expenses, and costs of suit; and

H. All such other or further relief as the Court may find to be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  January 22, 2021

By:  *s/ Stacy M. Bardo*
Stacy M. Bardo
**BARDO LAW, P.C.**
22 West Washington Street, Suite 1500
Chicago, Illinois 60602
Telephone: (312) 219-6980
*stacy@bardolawpc.com*

Benjamin F. Johns
Beena M. McDonald
Samantha E. Holbrook
**CHIMICLES SCHWARTZ KRINER &**
 **DONALDSON-SMITH LLP**
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

*bfj@chimicles.com*
*bmm@chimicles.com*
*seh@chimicles.com*

Steven D. Cohen (*pro hac vice motion
forthcoming*)
Susan J. Russell
J. Burkett McInturff (*pro hac vice motion
forthcoming*)
**WITTELS MCINTURFF PALIKOVIC**
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
*sdc@wittelslaw.com*
*sjr@wittelslaw.com*
*jbm@wittelslaw.com*

*Attorneys for Plaintiffs and the
Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 22nd day of January, 2021, a true and correct copy of the above and foregoing was filed with the Clerk of Court via the Court's CM/ECF system for electronic service on all counsel of record.

By: */s/ Stacy M. Bardo*
Stacy M. Bardo